TENNESSEE-CAROLINA MILLS et al. v. MRS. G. H. MAUK, Administratrix et al.

Eastern Section. October 3, 1931.

Petition for Certiorari denied by Supreme Court, January 23, 1932.

Seiler & Hunter, of Elizabethton, for appellants.

H. H. Haynes, Sr., and Curtin & Haynes, all of Bristol, for appellees.

PORTRUM, J. This suit was filed by Tennessee-Carolina Mills, a partnership, to set up a claim in the nature of a resulting trust

to a policy of life insurance, taken on the life of a former partner, now deceased, in the amount of $5000. The basis of the claim is that the two partners, G. H. Mauk, deceased, and Andrew Johnson Bachman, agreed to take out a policy of insurance upon their lives for the benefit of the partnership, and the partnership was to be named as the beneficiary in the policies, and to pay the premiums from partnership funds. Both applications were made to the Travelers Insurance Company, Hartford, Connecticut, for a policy on the life of each of the partners, through its local agent, S. G. Holly, at Elizabethton, Tennessee, February 12, 1927. And in the course of time the two policies, in the sum of $5000 each, were issued and delivered to the two partners, but the one issued to G. H. Mauk carried the name of his administrator as the beneficiary, while the other, issued to A. J. Bachman, carried the name of the Tennessee-Carolina Mills as the beneficiary. To cut off the right of the insured to change the beneficiary, borrow money, or to exercise any right given him under the policy in derogation of the partnership, an assignment was attached to each of the policies in favor of the Tennessee-Carolina Mills, the partnership. The assignment on the policy issued to Bachman was an absolute assignment, while the assignment on the Mauk policy was a conditional assignment. The latter assignment carried this provision:

"For value received, I hereby assign, transfer and set over unto George H. Mauk and Andrew Johnson Bachman, doing business as Tennessee-Carolina Mills (a copartnership), of Elizabethton, State of Tennessee (provided such partnership is in existence and I am a member thereof at the time of my death), all my rights, title, claims, interest, and benefit in and to the principal sum insured, in event of death, by the contract of insurance issued by the Travelers Insurance Company, Hartford, Connecticut, on my life, and numbered 303667.

"This assignment shall automatically become null and void upon dissolution of said partnership. In testimony thereof . . ."

These policies were delivered in March, 1927, and on June 16, 1927, the two partners entered into an agreement, dissolving the partnership by the purchase of all the interest of Mauk by his copartner Bachman, and under the terms of the agreement all the assets of the partnership passed from Mauk to Bachman, who assumed all the debts and obligations of the partnership. On July 9th following, Mauk made a deed of his interests to the brother and sister-in-law of A. J. Bachman, namely R. B. Bachman, and Mary Irwin, and Mrs. Irwin executed notes in the amount of $2000, in payment of her portion, directly to Mr. Mauk, the retiring partner. On November 29, 1927, Mr. G. H. Mauk died intestate, and then the controversy arose as to who was entitled to the proceeds of this policy.

It is the theory of the bill that the two partners agreed among themselves to take out a policy of insurance on each of their lives, in the sum of $5000, for the benefit of the partnership, and naming the partnership as the beneficiary in each of the policies; and while it is conceded that the partner Mauk was a man of integrity, and would not purposely defraud his partner by violating his agreement, nevertheless by inadvertence or mistake he had his administrator named as the beneficiary, and then made a conditional assignment of the policy to the partnership, which terminated the partnership's interest in the policy upon the dissolution of the firm by Mauk's withdrawal, and this conduct, which in fact was in violation of the agreement, was a fraud upon the partnership. And due to this conduct and the violation of this agreement, the partnership is in equity the true beneficiary, and entitled to the proceeds of the policy. If such were the agreement and the partnership was not named as the beneficiary by inadvertence, mistake, or with wrongful intent, then we think the partnership is the true owner of the policy and entitled to its proceeds. On the other hand, if the policy and the written assignment represents and reflects the understanding and purpose of Mauk, then his administrator is the rightful beneficiary and entitled to the proceeds.

Evidence which seeks to undermine and destroy a legal title to property represented by writing, must be clear, cogent and convincing, before the court will declare the ownership rests in another. If this were not true, written evidences of title would give small assurance of ownership. When in doubt equity follows the law.

Now, we are convinced that the act of Mr. Mauk in having the beneficiary named as his administrator was not an inadvertent act, but one done deliberately and intentionally. It either expressed the intention of the agreement as he understood it, or it was a deliberate fraud upon his part. There is no evidence in the record that he knew his partner was having the policy issued upon his life executed in a different manner than that issued upon his, Mauk's, life. The insurance agent, Holly, sent in the two applications for the two policies, and the policies were returned accompanied by two forms for the assignment of each; these forms are not the same, neither is the printed matter nor the typewriting, and it was necessary that the company be furnished with some information in reference to the conditional assignment form sent Mauk. The agent says this information was furnished in the application, but Mauk's application and his policy are not in the record. However, the complainant attempts to supply this missing proof by showing by the partner Bachman that both policies and applications were the same. Upon an examination of the application attached to Bachman's

policy, which is in the record, it is apparent that no information is contained in it in reference to a request for the assignment. It is necessary then that the company be communicated with by letter, and no attempt is made to show the contents of this letter in the proof. The agent says he did not write such a letter, and it follows then that Mauk must have written it. This would have elucidated the issue, and reflected the intent and purpose of Mauk. The company has within its possession some material evidence which should have been produced upon this hearing. The conditional assignment made by Mauk probably was filled out in typewriting by the company, for on the back of the assignment occurs this instruction written on a different typewriter:

"March 11, 1927. The Travelers Insurance Company, Hartford, Connecticut. Dear sir: Please send duplicate notice of premiums due under the contract described in the within instrument, to the following address: (Name) Tennessee-Carolina Mills, Elizabethton, Tennessee."

If the company filled out the conditional assignment, it must have had advice in reference to the proviso placed therein; but if Mauk filled out the proviso, then he certainly understood its purpose and could not have done it inadvertently (he probably did so, for the personal pronoun "I" is used, and the company would not have used the personal pronoun). We cannot believe that the naming of the beneficiary, or the wording of the conditional assignment, was an inadvertent act, we think it was a deliberate act. The complainant had it within its power to throw further light upon this issue by the production of a copy of the policy and application, together with the correspondence leading up to the issuance of the policy; the defendant produced a photostatic copy of the conditional assignment and these papers must be available in the hands of the insurance company. As we have said, this conditional assignment reflects the true intent, or was a deliberate fraud. We might state here that the method followed by Mauk was a desirable method to follow in like cases; the partnership had an insurable interest in the partners, and when once it is attached it continues even after the withdrawal of the insured partners, and a partnership could continue a policy assigned as was Bachman's, indefinitely, long after the partners had withdrawn from the partnership and new partners taken into the partnership. A partner insured as Bachman was insured, would have no control over the policy, and in time his death might become of much moment to his enemies. George H. Mauk may have understood this and provided against this contingency; before we will say that he did it for the purposes of defrauding, it must clearly and convincingly appear that his act vio-

lated an agreement, made with his partner, to insure his life for the sole and continuing benefit of the partnership.

The complainant attempts to establish the agreement by the testimony of the partner Bachman, and the agent Holly. A few isolated circumstances are advanced as corroborating this testimony. Mr. Bachman was asked in reference to the contract:

"Q. You may state what the partnership agreement was with reference to insuring the life of the members for the benefit of the partnership, if there was any such agreement? A. Yes, we were to take insurance on our lives and the Tennessee-Carolina Mills was to be the beneficiary.

"Q. And were these policies taken out pursuant to that agreement? A. Yes, they were.

"Q. Did you ever agree with Mr. Mauk, or anyone else, that the interest of the Tennessee-Carolina Mills in this policy should be in any wise mentioned by a rider or assignment of any kind? A. I did not.

"Q. Did you know before his death that the rider, or so-called assignment, on his policy differed from the one you had executed and was attached to your policy? A. I did not.

"Q. Did you suspect any such thing as that? A. I did not.

"Q. You made this assignment with your policy an absolute assignment, did you? A. I did.

"Q. Did you or not execute it expecting and believing his to be the same? A. I did.

"Q. These applications, do you know whether or not they were exactly the same except as to age and name? A. They were.

"Q. When did you first discover this difference and what in consequence of that did you do? A. After his death I took the policy to the First National Bank to have Mr. G. J. Holly notify the company of his death.

"Q. When you took the policy to Mr. Holly had you discovered the difference at that time? A. No.

"Q. When was it discovered? A. After I took it to Mr. Holly."

It is noticeable that the witness' replies are short and consist principally in answering "Yes" and "No," following leading questions. This was his only attempt to tell what took place in making these contracts; at time of the issuance of the policies none of the details involved or the reason for taking the policies are given by the witness. No conversation with the agent is detailed; we are left with the bare statement that the agreement was to take the policy for the benefit of the company, and the company was to be made the beneficiary. The witness states here, and all through his direct examination, that the policies and the applications were the same.

522

except the names of the insured; these answers were made to lead-ing questions propounded to him by his counsel, and there is no reason why he should have misstated it, but on cross-examination he admits that the beneficiary in the Mauk policy was Mauk's executor, while the beneficiary in his policy was the Tennessee-Carolina Mills. We do not think he purposely misstated these answers, but that he testified to facts when he did not know these facts. The applications could not have been the same either, for he had designated the Tennessee-Carolina Mills as the beneficiary to be named in the policy. The other application is not before us, but we do not think the company would have violated the instructions contained in Mauk's application blank. The witness says the policies were to be taken for the benefit of the partnership. Mauk's policy was in fact taken for the benefit of the partnership, and continued in its benefit until the date of the dissolution of the partnership. This portion of the testimony does not impeach the written instrument. The witness says that it was the agreement that the beneficiary in the policy of Mauk's was to be the partnership. This is the only direct evidence of fraud on the part of Mauk in making his administrator the beneficiary. As heretofore said, there is no background attached to the probated value of this statement. There is no conversation leading up to the contract shown, nor any conference with the agent, who wrote the policy, shown; the policy itself is not in the record. And it is not shown that Mauk had anything to do with the issuance of the policy on the life of Bachman, or to believe that the beneficiary in that policy was the partnership, or that he knew it was different from the terms of his policy. This bare statement of the terms of the contract is meager evidence to divert title out of one and into another; especially when that other is mistaken in so many material facts appearing in the record.

The witness G. J. Holly is the agent who wrote the policy, and is the cashier of a bank in Elizabethton. He was asked:

"Q. State whether they procured you to write a policy on the lives of each of them, respectively, for the benefit of the partnership? A. Yes sir.

"Q. You, as an agent writing insurance—procuring it were advised by the arrangement between them and their purpose in making it payable to the partnership? A. Yes sir.

"Q. Was it or not an agreement between them that each life would be insured at the expense of the partnership for the benefit of the partnership? A. Yes sir.

"Q. Who paid the premiums on these two policies? A. The Tennessee-Carolina Mills.

· · · · · · ·

"Q. Mr. Holly, please state when you first learned that there was any difference between the rider or assignment attached to the Bachman policy and that attached to the Mauk policy? A. I don't remember the date when it was.

"Q. Indulging in what I am asking for with reference to the death of Mr. Mauk? A. I don't remember whether it was right after the death of Mr. Mauk or not, I believe it was right after his death.

"Q. Can you state whether or not you knew of any such difference before his death? A. No sir.

"Q. State just what you mean by that answer—whether you did know or did not know of any difference? A. I mean I didn't know of any difference."

The foregoing testimony is what the agent knew in reference to the contract between the partners. He sets up the contract and the breach of trust in two words—"yes sir." But does he? Did not Mauk do just what the question indicated? The policy was in fact issued for the benefit of the partnership. This agent doesn't attempt to detail any conversation taking place before the applications were written, he knew nothing about the assignments, but he does say the applications contained a request for the assignments. Upon examination of Bachman's application there is no such request contained within it. He knew nothing of the conditional assignment until after Mauk's death, and he is not in a position to swear in reference to its form. This witness throws absolutely no light upon this transaction.

If will be necessary to make a further statement of the facts before accepting a few circumstances that might be considered favorable to the contention of the complainant. Upon the death of Mauk, the partner Bachman examined the policy and discovered that the assignment was a conditional assignment which terminated upon the dissolution of the partnership, in conjunction with the agent, he thereafter met Mrs. Mauk upon the street in Elizabethton, four days after the death of her husband, and when she was there to qualify as his administrator, and invited her and her brother, who was accompanying her, to his home for lunch. At the home he called Mrs. Mauk apart and told her that he had the policy, but that the assignment on it was a conditional one and it was payable to her husband's estate; she stated that he then explained to her that he had an agreement with her husband to take out the insurance in favor of the partnership, and that when he purchased her husband's interest it passed with the contract or agreement of purchase; that he also had a conversation with her husband at that time in reference to the policy, when it was agreed that the partnership would continue to carry the policy on the life of her husband. He states that

she then agreed that the proceeds belonged to the partnership, and that she would take the policy, collect it and turn the proceeds over to the partnership. He states that he offered to pay her something for her trouble, and had in mind about $1000. He relies upon this agreement to estop the administrator from claiming the proceeds of the policy. The administratrix denies that she made any such agreement with Mr. Bachman, and she is corroborated by the testimony of her brother, who was present, and we might here state that Mr. Bachman was corroborated by the testimony of his wife, who was also present. The administratrix testified that she agreed to take the policy and collect it and if it belonged to the partnership to turn it over to it. She was not advised of her right at the time, and made some statement about employing a lawyer, but Mr. Bachman assured her that this was not necessary. Bachman admits this, and also that the wife was stricken with grief, but he says the reason he advised her not to employ a lawyer was because he believed he would have to pay the fee. A great portion of the testimony in this record is taken up in an effort to establish the relative contention of the parties on this question. If the funds from this policy belonged in equity to the partnership, the administratrix's agreement would add nothing and take nothing from the partnership's right, and on the other hand, if the funds belonged to the estate, the widow and administratrix had no right to make an agreement that would denude the estate of its assets, especially in the absence of a consideration. The evidence does establish a sharp conflict between the parties, who are the witnesses. And this conflict tends to cast doubt upon the testimony of the witnesses, and does not leave it free as clear and convincing testimony.

The witness Bachman testified that at the time he purchased the interest of Mauk, the written agreement of sale covered this policy and carried it to the partnership as an asset of the partnership. This agreement reads as follows:

"For the sum of $1 receipt of which is hereby acknowledged, I have this day sold to A. J. Bachman my one-half interest in the Tennessee-Carolina Mills, located in Elizabethton, Tennessee, for the sum of $3,000, one thousand cash and balance to be later agreed upon. Said A. J. Bachman is to transfer his interest in the N. Hughes property recently bought by A. J. Bachman and G. H. Mauk, to G. H. Mauk, also to have R. N. Bachman to transfer his one-half interest in the property recently purchased by him and G. H. Mauk, to G. H. Mauk.

"Said G. H. Mauk is to assume all the indebtedness against the two above mentioned pieces of property. Said A. J. Bachman is to assume all indebtedness of G. H. Mauk against the Tennessee-Caro-

lina Mills, deeds and transfers to be made within the next fifteen or twenty days or as soon as practical.

"The exchange of G. H. Mauk's interest in said Mills to A. J. Bachman includes all trucks, cars, accounts, cash on hand, cash in banks, merchandise in stock or all his interest both real and personal."

If the partners discussed this policy and it was agreed between them that the policy should continue as the property of the partnership, then the contract which undertook to name in detail the other assets, concluding with "all his interest both real and personal," should have specified this policy, for we are sure G. H. Mauk, the insured, knew that the policy terminated at the date of the dissolution of the partnership. This contract carried only partnership property, and interest of the partnership in the policy ended when the partner Mauk withdrew. It does not by its terms pass the individual property of Mauk, and this policy, no more than any of his other policies, would not pass under this contract to the partnership.

This claim of ownership to the proceeds is different from that claimed in the bill, and there is no prayer in the alternative to set up an assignment of the policy, made at the date of the contract of dissolution, and there is no prayer for general relief. A claim of the assignment of a policy (the ownership of which is in the copartnership), to the partnership, is inconsistent with the position taken in the bill. But as a corroborating fact of his conversation with the partner Mauk, and the assignments, he states that Mauk removed all of his private papers out of the partnership's safe, and left this policy. The girl in the office said that Mauk went to the safe and removed his papers and then turned the keys to the safe over to her. She did not know what papers he was removing, nor from what portion of the safe he removed them. This was a negative act and does not carry the weight of a manual delivery of a paper in support of an oral assignment. Mrs. Mauk testified that she does not think he removed all his private papers out of the safe, for he told her that it was more convenient for him to keep certain papers there. Mr. Bachman says he moved all his private papers and left this policy in the safe, where he saw it. This is what Bachman says with reference to this assignment:

"Q. Was there anything said about carrying this policy? A. Yes, it was to be carried by the Tennessee-Carolina Mills. I told him I intended to keep up the premiums upon this policy, but I hoped it would be a long time before I would have to collect it, or something to that effect.

"Q. You told him that when you and he dissolved the partnership? A. Yes sir.

"Q. You told Mrs. Mauk about that? A. Yes sir.

"Q. What did she say? A. I don't remember her commenting on it."

By reading the testimony which immediately precedes this quoted testimony, it is seen that the witness is testifying to what he told Mrs. Mauk on the day of their conference, when she agreed to collect the insurance. This is an indirect way of showing what conversation took place between the parties; he is not testifying as to what he and Mauk said, but is testifying to what he told Mrs. Mauk on that day. This answered the purpose if the bill was to set up the resulting trust, but not if to set up an independent claim of an oral assignment of the policy.

If this policy had been an ordinary life policy, his statement in reference to keeping the premiums paid up, notwithstanding the insured lived a long time, would have been a reasonable statement; but the policy was a five-year term policy and expired by its own limitation at the expiration of the fifth year; it was convertible at the end of the term, but it is not insisted that the partnership had a right to compel the insured to convert it. Bachman's policy was of the same character, and he certainly knew of its provision, and it is not plain why he would carry on this conversation with the insured, and why the insured would not then have called his attention to the fact of the conditional assignment.

We do not think the complainant has carried the burden of proof and established the equitable ownership in the proceeds of this policy, for our minds cannot rest easily upon the issue; certainly the evidence is not clear, cogent and convincing; on the other hand we are inclined to think that G. H. Mauk did not act in bad faith towards his partner, but that the written evidence of ownership reflected the true purpose of the party. The complainant, in the bill, gives Mauk a high character, and disclaimed a purpose to charge that he did anything with a wrongful intention, and from the record we do not believe he acted wrongfully in the matter, but do believe he acted honestly, and in conformity with his interpretation of their agreement. He took the insurance out for the benefit of the partnership so long as he was a member of it, and no agreement to the contrary has been clearly, cogently and convincingly established.

This finding is not adverse to the finding of the Chancellor; he evidently was not satisfied with the weight or convincing character of the proof of this contract, for he declined to grant a recovery for the full sum of the policy, but did grant a recovery to a creditor for a portion of the policy. If he had been satisfied with the proof he would have granted a recovery in favor of the complainant for the full value of the policy.

This brings us to the claim of the Holston National Bank of Elizabethton, a creditor of the partnership, and who intervened in this cause as a party complainant, by a supplemental bill asserting ownership to the funds because of an assignment made by the partnership to the bank to secure its outstanding indebtedness. Some of this indebtedness was incurred before the dissolution of the partnership and for which Mauk was responsible, until his liability was assumed by the new partnership, and which was evidenced by promissory notes which had been renewed since the formation of the new partnership, but without the endorsement of Mauk. The Chancellor was of the opinion that this creditor was entitled to recover the outstanding indebtedness due it from the partnership at the date of the dissolution and that the funds derived from this policy were subject to the satisfaction of this indebtedness. He granted a recovery for this indebtedness, which amounted to more than $4000, but declined to grant a recovery in favor of the partnership for the balance; his action has been assigned as error both by the appellants and appellees. This creditor is not seeking to impound this fund as assets of the partnership, when in an insolvent condition, but relies solely upon its assignments. It must stand then in the shoes of its assignor, and if the assignor, the original complainant, cannot recover, then it cannot recover. In treating the conditional assignments of the policy to the partnership as valid, as we must under the proof, then the only interest of a creditor in the policy must be measured as of the date of the dissolution; at that time creditors or the partnership would be entitled to the cash surrender value of the policy. Had the partnership continued and been wound up in June, 1927, as an insolvent business, the creditors would have been entitled under the assignment of the policy only to the cash surrender value. This, however, was a convertible term policy and carried no cash surrender value at the termination of the policy years. There was nothing for a creditor to subject to his claim. The Chancellor erred in granting a recovery in favor of this creditor against the defendant. His decree in this respect will be reversed.

There is another circumstance, that we cannot refrain from mentioning, that casts a doubt upon the testimony of the complainant, and it is that this policy was collected February 3, 1928, this bill was not filed until August 30, 1929, and in the meantime the administratrix had brought suit against Mrs. Irwin, one of the partners, to collect $1500 of the purchase money notes given by her in the purchase of an interest in the partnership. Mrs. Irwin had become mad, and Mr. Bachman says he had intervened, and she had insisted upon the prosecution of this suit. It is not clear why he

528

would have waited this long if he was conscious of a just claim against this estate. For the reasons stated the decree of the Chancellor is reversed and the suit dismissed at the cost of the appellees.

Snodgrass and Thompson, JJ., concur.