IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 5, 2005 Session

## ARC LIFEMED, INC., ET AL. v. AMC-TENNESSEE, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 01-3163-II     Carol McCoy, Chancellor**

---

**No. M2003-02640-COA-R3-CV - Filed August 2, 2005**

---

This is an action for breach of contract by a limited liability company against its managing member. The other members of the LLC joined as plaintiffs seeking recovery for breach of fiduciary duty and negligent misrepresentation. The managing member counterclaimed against the LLC for breach of contract and, in the alternative, sought recovery in *quantum meruit* for unjust enrichment. The trial court held the managing member to be liable to all plaintiffs on all issues and dismissed the counterclaim. The action of the trial court is reversed as to breach of fiduciary duty and negligent misrepresentation. The judgment of the trial court is affirmed as to breach of contract and as to dismissal of the counterclaim. The findings of the trial court as to damages payable to the LLC is affirmed as is the distribution of the assets of the LLC. Prejudgment interest is disallowed, and costs are assessed to the managing member.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part,**
**Reversed in part and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Barbara Hawley Smith, Nashville, Tennessee, Robert P. Johnson, Pro Hac Vice, Cincinnati, Ohio, for the appellant, AMC-Tennessee, Inc.

Charles W. Cook, III, James E. Gaylord, Nashville, Tennessee, for the appellees, ARC LifeMed, Inc., LifeTrust America. Inc. and LifeMed, LLC.

### OPINION

This case involves the supply of pharmaceutical products to persons residing in assisted living facilities and the collection of payments for such products. ARC Lifemed, Inc. ("ARC") is a large corporation with many years of experience in the nursing home business. LifeTrust America, Inc. is a corporation formed in 1996 during the infancy of assisted living facilities ("ALF") constructed to house residents who are in need of assistance but are not physically or mentally

disabled to the point that they require nursing home care. AMC-Tennessee, Inc. ("AMC-TN") is a sizeable retail pharmacy.

## I. HISTORY OF LIFEMED, LLC.

ARC was a long-standing leader in the construction and operation of nursing home facilities, principally in the eastern and southeastern United States, prior to the advent of ALF in the mid 1990s. Desiring to enter the ALF field, ARC, in 1997, embarked upon a plan to develop 40 assisted living facilities. By the fall of 1998, ARC had 20 such facilities in operation. LifeTrust, Inc., organized in 1996, had no prior experience in the ALF market but, by the end of 1998, was operating 30 such facilities. LifeTrust began exploring ways to develop revenue from sources other than the typical provision of room and board. It recognized that the pharmacy business might provide additional income. LifeTrust began discussing the formation of a joint venture with "The Pharmacy," an institutional pharmacy serving skilled nursing facilities and assisted living facilities primarily in Tennessee. "The Pharmacy," owned and managed by Buddy Stephens, had a good reputation and had profitably concentrated its business in the long-term care market. LifeTrust learned that "The Pharmacy" would soon be acquired by American Medserve Corporation. Following this acquisition, "The Pharmacy" was named AMC-TN. Later, American Medserve would itself be acquired by Omnicare, Inc., the leading institutional pharmacy in the nation, but AMC-TN would retain its separate identity.

During negotiations between LifeTrust and AMC-TN, the concept of "the pharmacy within a pharmacy" ("PIP") was discussed under which a joint venture would operate on AMC-TN's physical premises to supply pharmaceutical service and products to LifeTrust and its ALFs. The PIP arrangement would allow the joint venture to share the overhead of an established provider and utilize those services without having to overcapitalize the project. LifeTrust and AMC-TN formalized their joint venture with the creation of LifeMed, LLC in 1997. LifeTrust contributed $200,000 in exchange for a 40% ownership in the joint venture. AMC-TN contributed $300,000 for the remaining 60% ownership interest. A Limited Liability Company Agreement established a board of managers for LifeMed, LLC.

In 1997, ARC learned of the LifeMed, LLC joint venture while searching for ways to increase its revenues. Unlike LifeTrust, ARC had some prior experience with the pharmacy business, having operated an institutional pharmacy in Richmond, Virginia. ARC learned that the LifeMed joint venture had been operating at a breakeven point financially. In 1998, ARC contributed $300,000 to the venture with AMC-TN receiving a $150,000 distribution of capital from the joint venture at such time. An Amended and Restated LLC Agreement executed by the three parties allocated ownership equally among the members.

Two agreements governed the joint venture following the admission of ARC as a joint venturer. These were the Amended and Restated Limited Liability Company Agreement (the Operating Agreement) dated October 29, 1998, and the Management Agreement previously executed

on June 11, 1997,between LifeTrust, Inc. and AMC-TN under which AMC-TN was to manage the joint venture. This agreement remained effective after the Amended and Restated LLC Agreement.

By the Amended and Restated LLC Agreement, a one-third ownership interest was assigned to each member with each member appointing two representatives to the Board of Directors of LifeMed. This Agreement provided that no portion of the capital funds of LifeMed could be withdrawn at any time without the approval of all members and that upon termination, dissolution, and liquidation of LifeMed, each member's capital account was to be distributed. Each member could withdraw from LifeMed at any time and receive a return of its positive capital account balance.

According to the Management Agreement, AMC-TN was engaged to manage LifeMed's business. In return, AMC-TN was entitled to a management fee which it would earn by performing certain duties for the Owner, LifeMed. Among these duties, the Agreement prescribed the following:

1.  **Retention of Manager.** Owner hereby retains Manager to provide management services in connection with the Pharmacy under the terms and conditions set forth herein. The Operating Agreement describes various additional duties for which Manager is also responsible including, without limitation, Budgets (Operating Agreement, Section 4.4) and various responsibilities for books, records and accounting matters (Operating Agreement, Article 5). The Owner and Manager intend that the management fee described in this Agreement shall be full and complete compensation for the Manager for the provision of its services described in this Agreement as well as the provision of those additional services required of the Manager pursuant to the Operating Agreement.

2.  **Responsibilities of Manager.** During the Term, as defined below, Manager shall provide the following management, consulting and advisory services to Owner in connection with the operation of the Pharmacy, and shall devote such time, expertise, and resources as may be appropriate to properly manage the Pharmacy as provided herein:

. . .

B.  **Bank Accounts; Payment of Business Expenses.** Manager shall direct the opening and closing of bank accounts in the name of Owner for the benefit and account of Owner in a bank of Manager's selection, which shall be approved by the Board of Managers, and shall direct the deposit therein of all money received in the course of the operation of the Pharmacy. Manager shall cause all expenses incurred in the operation of the Pharmacy, including, but not limited to, payment of Manager's fees and expenses hereunder, debt services, payroll, benefits and related employee expenses, to be paid, at the Owner's expense, by check drawn on such accounts and signed by such party or parties as may be designated by Manager and approved by the Board of Managers.

. . .

H. **Bookkeeping and Accounting; Taxes.** Manager shall direct the bookkeeping and accounting procedures necessary for the operation of the Pharmacy and the preparation of proper financial statements and records. Bookkeeping and accounting procedures and systems shall be in accordance with the operating capital and cash programs developed by Manager, which programs shall conform to generally accepted accounting principles. Managers shall maintain the general ledger for the Pharmacy, cause payment of the accounts payable pursuant to Section 2.B. and prepare periodic financial statements as required by Article V of the Operating Agreement. Under Manager's direction, Owner shall maintain the accounts receivable for the Pharmacy, and receive, deposit and report on cash receipts on forms provided by Manager. Subject to the provisions of Section 5.7 of the Operating Agreement, Manager shall prepare and file all tax returns with respect to the Pharmacy.

3. **Responsibilities of Owner.** During the Term, as defined below, Owner's responsibilities shall include, but not be limited to, the following:

A. **Operational Policies.** The Board of Managers of the Owner shall develop and implement all operational policies and procedures necessary to establish and maintain the standard of pharmacy services appropriate for the nature of the Pharmacy.

B. **Charges.** The Board of Managers of the Owner shall establish the schedules of recommended charges for pharmaceutical products and services provided by the Pharmacy.

. . .

5. **Management Fees.** For services performed hereunder, Owner shall pay to Manager a management fee equal to Manager's actual costs incurred in providing the services to be performed by Manager hereunder, plus ten percent (10%). As such costs of Manager will only be determined semi-annually (as hereinafter provided), until such costs have been determined, Owner shall pay Manager on an interim basis an interim fee of Four Dollars ($4.00) for each prescription processed and filled by Owner. Owner shall pay such interim fees monthly, in arrears, no later than the last day of the month following the month during which such management fees were earned. Manager shall be entitled to cause all such amounts to be disbursed to itself out of the accounts provided for in Section 2.B. hereof. Within forty-five (45) days after the completion of each six-month period of July 1-December 31 and January 1-June 30 hereunder (provided, that the first period shall be June 11-December 31), Manager shall deliver to Owner and

-4-

LifeTrust an itemized statement of Manager's direct and indirect costs of providing the services to be performed by Manager hereunder. Manager shall cooperate with LifeTrust and Owner in answering any questions and addressing any objections relative to Manager's costs as set forth on such itemized statement, and shall permit Owner and LifeTrust to audit the books and records of Manager relating to such costs. Owner and LifeTrust hereby agree not to disclose any information provided by Manager which constitutes confidential business information of Manager, and not to use such information other than for purposes of determining the fees to be paid to Manager hereunder, in each case except as otherwise required by applicable law or court process. Based upon Manager's actual costs of providing the services to be performed by Manager hereunder (costs plus 10%) against the interim fees previously paid to Manager on an interim basis (initially, $4.00 per prescription), and Manager or Owner, as the case may be, shall pay any overpayment or deficiency of the interim payments as compared to the cost-based management fee to be paid hereunder, as applicable. Based upon such itemized costs, Owner and Manager (with the consent of LifeTrust, which shall not be unreasonably withheld, delayed or conditioned) shall establish a new interim fee to be paid hereunder for the next semi-annual period, which shall approximate as closely as practicable the projected costs of Manager for the next semi-annual period, plus ten percent (10%). Such reconciliation of costs to interim fees and re-setting of the interim fees to be paid shall be made after each semi-annual period.

. . .

7. **No Guaranty of Profitability.** Owner acknowledges that Manager does not guarantee that the Pharmacy will be profitable.

## II. LIFEMED, LLC IN OPERATION

Prior to the beginning of the LifeMed, LLC joint venture, Buddy Stephens, The Pharmacy, American MedServiceCorporation, and AMC-TN had extensive experience in the nursing home pharmacy supply business. ARC had some experience having, for some period of time, owned an institutional pharmacy serving its nursing home facilities. Newly-formed LifeTrust, Inc. had no experience in supplying pharmaceuticals to nursing homes. Assisted living facilities did not come into being until the mid-1990s, and none of the parties had any experience in supplying the pharmacy needs of assisted living facilities. While one might think that the transition from nursing home supply to assisted living facility supply would involve a simple conversion, the parties learned that such an assumption was far from the truth. The operations manager for AMC-TN, Ms. Julie Frazier, explained the differences between the underlying problems of serving the pharmacy needs of nursing homes as compared to supplying the same needs in assisted living facilities.

Q. Could you give us a little more detail and background on the mix of the customer base of The Pharmacy prior to the formation of the joint venture?

A          Sure.  Prior to the joint venture, our customer base was primarily nursing home.  It's a different population than assisted living, in that probably 80 percent of that business is TennCare related, another, you know 10 to 15 percent of it is Medicare related, in which either the payor of the bill is TennCare or Medicare. You have about a 5 percent population that's private payor, private insurance.

The assisted living side is practically just the opposite.  You don't have any Medicare because Medicare still doesn't have drug benefit program.  You don't have a lot of TennCare because that population in an ALF typically has a son or daughter that's paying the tab for them.

So the majority of that population was private pay, private insurance, had the ability to, you know, do the things that they wanted to do and was a little bit freer population than what we were used to seeing in a nursing home setting.

Q.          Did the different mix, the TennCare and Medicare on the nursing home side versus more of a private pay insurance mix on the assisted living facility side, have any effect on collections?

A          Absolutely, for multiple reasons.  One of them which I've already talked about is that if you don't get the correct information on a timely basis, then there are limits as to when you can file insurance claims.  And the other thing is you have a more – – a population of people that have a bill that they've got to pay, and lots of times the last payor (sic) that they think about is the pharmacy or a vendor. You know, they're going to pay their room and board first, and from that point they'll pay whoever's left over.

You've got a sicker population of people.  You wouldn't think that, but what happens in the nursing home setting is where we have such regulations that we have to comply by, we have a tendency to do things a little bit different.  We have consultants in their building once a month who go through a drug regimen review process where we try to make recommendations to the doctor to reduce their medications, whereas in an assisted living populations, you have don't have that. You know, they complain about their foot hurting and they give them something for it, and that's the easiest way to keep them from complaining.

The average prescription rate – – and I know in our business that – – and during the LifeMed joint venture – – was right around ten prescriptions per resident, whereas in our nursing home setting it's more like seven or eight.  So their drug bills were higher.  They may have had private insurance that sometimes would pay for it, but they still had co-pays.  And so their drug bills typically ran higher than what you'd see in a nursing home population.

Q.              When the joint venture started in 1997, operationally what was involved in getting that set up?

A.              We had to go out in the homes – – or the communities, I should say, and you had to gather information. You gathered information, as much as you could, about their drug therapy, about insurance information. You had to set up responsibility documents, in other words, who was going to be responsible for the bill.

Internally we had to go through the process of getting prescriptions, because it is considered a retail environment. So we had to contact the doctors and get prescriptions. We had to verify all that insurance and make sure that we were a provider for that insurance, and if we weren't, start the process for getting on their list of preferred providers. We had to set them up in the machine. You know, we had a brand-new piece of equipment that we'd been trained on that we hadn't used a lot of.

Q.              Is that the Baxter machine?

A.              That's the Baxter machine. It was a learning curve for anybody. And we used that machine, we tried it, and it worked pretty well. But as we added more business and it started having to produce more, that's when we starred (sic) seeing our problems.

At the time the joint venture was launched under the Management Agreement June 11, 1997, the "pharmacy-within-a-pharmacy" concept was implemented. Joint venturer and managing venturer, AMC-TN, was in fact a pharmacy, and only a pharmacy (though a very large pharmacy) and was supplying its own clientele separate and apart from the assisted living facilities it was supplying in its capacity as manager of LifeMed, LLC.

LifeMed, LLC operated only for the limited period between the inception of the Management Contract in June of 1997 and August 2000, when the decision was made to dissolve the joint venture. From the beginning, troubles developed relative to separation of inventories between The Pharmacy and the PIP. Said Julie Frazier:

A              There were two things that we needed computer-system-wise. No. 1 was we needed to upgrade our hardware and we needed to upgrade our software. In order to upgrade our software, we had to upgrade our hardware. The purpose of it was to hopefully be able to separate, without having to do a lot of extra work, the A/R [Accounts Receivable] and the billing between the LifeMed joint venture and AMC-Tennessee.

Q.              Was there a problem separating the billing of the two entities?

A          Because we were running off of one inventory and we were running off the same computer system, it was all being processed under one company. We did come up with methodology in order to separate the LifeMed A/R from The Pharmacy's A/R, and we put that into place.

Q.          According to your deposition, you testified that the upgrade was never – – that you never got the upgrade.

A.          We did get the upgrade but not before the joint venture was dissolved. We had to do a work-around, which we were able to do.

Q.          So until after the JV was dissolved, all the A/R was on the same computer system?

A.          That is correct.

Q.          And it was not easily separated?

A.          Once we did the work-around, the only part of it that we weren't able to resolve – – separate, I guess I should say, easily was the third party. As far as the private, private insurance guarantor type A/r, we separated that. The third party was a little bit more difficult.

Q.          But before the joint venture was dissolved, it was hard to separate the accounts receivable?

A          No, we separated before the – – we separated the guarantor or the private pay side prior to the joint venture dissolving. We were not able to separate the third party.

Q.          What's the breakdown between third party and private pay for the joint venture

A.          The private insurance side was probably 65, 70 percent. But you've still got a private pay portion to that. I mean, even if you bill the insurance company, you've still got the co-pays and stuff that fall into the private pay side.

Q.          Now, with respect to inventory, there were problems with the cost of goods generator and so the inventory was separated sometime in late 1999; is that correct?

A.          We separated the inventory in early 2000.

Q.　　　　　And physical inventories were done every two to three months?

A.　　　　　That's correct.

Q.　　　　　Now, there was borrowing between – – once you separated the inventory – – well, can you explain how the inventory was separated for the Court?

A.　　　　　We physically tried to separate the two pharmacies from the downstairs of our building. We had a two-story building. And in the downstairs of our building – – we put our nursing home or The Pharmacy or AMC's operation in the downstairs. The upstairs, we put the LifeMed joint venture. So we separated their inventory upstairs, AMC's inventory downstairs.

While overestimation of the ALF market and shortcomings in projected participation by ALF residents played a significant role in the failure and demise of LifeMed, LLC, it was a combination of difficulties in inventory control and inflated value of collectible accounts receivable that brought about this litigation among the parties.

The inventory problem from the beginning of LifeMed, LLC, according to AMC-TN's expert John Gould, emanated from a combination of the "pharmacy-within-a-pharmacy" concept and the use of an inaccurate cost generator in the calculation of inventories. Said Mr. Gould:

THE WITNESS: The cost generator is a very educated estimate.

THE COURT: Like an actuary, tell me what it is.

THE WITNESS: I'm sorry?

THE COURT: Like actuaries do, tell me, what is a cost generator.

THE WITNESS: A cost generator is another term used to identify what your cost of product sold was. In most businesses that move inventory, they are able to identify, as it goes out the door, the cost of that product to them on an individual basis. You know, a widget company can tell you that Widget A cost them $5.

In the pharmacy business, because of the volume of products that we have, we don't have the system capability to help us track every individual product leaving the door. We have in upwards of 15,000 different products that could leave our doors. So we can't, as those drugs are leaving the door, identify at that particular point in time what that cost was to us in our systems.

So from a financial standpoint, very general basic accounting is, if you're going to make a sale of inventory, you have to have a cost associated with that. And in the pharmacy world the way we do that is through this cost generator. And this generator is simply a percent of sales that has been developed over time through experience, through reconciliations with your physical inventories and through just general industry knowledge of certain margins on drugs.

On a monthly basis, that generator or that percent is applied to net sales to identify what the estimated cost of product sold was as it relates to the product that was sold in that particular time period.

BY MR. COOK:

Q:    So at some point you do physical inventories to sort of readjust your cost generator?

A:    Yes, we do.

Q:    And so it's a moving number, in effect?

A:    It can fluctuate. I mean, for the most part it's static unless you have a lot of changes going on in your business.

Mr. Gould further testified that a "cost generator" was at best an educated guess and that if the cost generator used was markedly inadequate, it would result in great discrepancy between the on-paper inventory used in accounting and the substantive inventory that was actually on hand. As relates to accounts receivable in pharmacy billing practices, to get from gross to net, two qualifiers must be considered.

As explained by John Gould:

Q.    And in terms of preparing the financial statements, if I look at a typical financial statement, I'm going to see accounts receivable, correct?

A.    Yes.

Q.    And I'm talking about a balance sheet.

A.    Right.

Q.    And I'm going to see – – under that I'm going to see, I guess, two qualifiers, one is allowance for bad debt, is that correct, and the other one would be contractual disallowances?

A.      Yes.

Q.      And can you explain what those two terms are?

A.      Sure. Going back to two of our payor types, which were Medicaid and third-party insurance, we typically bill – – there's an allowable amount that they're going to pay, and it's pretty standard. I mean, the state has an allowable reimbursement rate, insurance companies have allowable reimbursement rates. It is a practice of ours, and actually in the industry, to bill more than what they say they're going to pay for.

        And the reason is, if you bill less than what they say they're going to pay for. They're going to pay that. So in order to maximize – – to make sure you're maximizing the benefit of what they're going to pay for, you typically bill above what you know they will pay for. The difference between what you bill and what they pay is called a contractual disallowance. And, again, that's only for Medicaid and third-party insurance.

Q.      Okay. And how about allowance for bad debt?

A.      Allowance for bad debt is a reserve on uncollectible acounts.

Q.      And is it a generally accepted accounting principle to reserve against accounts receivable?

A.      Yes.

        In order to understand the problem with accounts receivable, which was the subject of extensive expert testimony, it is necessary to excerpt from the balance sheets prepared under the management contract by AMC-TN and submitted to LifeMed, LLC. Beginning in July of 1999, these balance sheets disclose:

| Date | Acct Rec. (Trade) | Contractual Disallowance Reserve | Doubtful Acct. Reserve | Net Accounts Receivable |
|------|-------------------|----------------------------------|------------------------|-------------------------|
| 7-31-99 | 663,121 | (116,379) | (25,000) | 521,742 |
| 8-31-99 | 742,821 | (145,072) | (26,000) | 571,749 |
| 9-30-99 | 794,862 | (164,004) | (27,000) | 603,858 |
| 10-31-99 | 773,225 | (169,374) | (28,000) | 575,851 |

| | | | |
|---|---|---|---|
| 11-30-99 | 880,579 | (180,849) | (29,000) | 670,730 |
| 12-31-99 | 671,943 | (45,663) | (30,000) | 596,280 |
| 1-31-00 | 836,213 | (68,074) | (33,500) | 734,639 |
| 2-28-00 | 904,980 | (101,471) | (37,780) | 765,729 |
| 3-31-00 | 965,986 | (160,159) | (43,012) | 762,815 |
| 4-30-00 | 997,201 | (165,139) | (47,681) | 784,381 |
| 5-31-00 | 1,037,491 | (172,823) | (52,374) | 812,294 |
| 6-30-00 | 980,947 | (158,201) | (55,916) | 766,830 |
| 7-31-00 | 1,117,839 | (208,133) | (62,250) | 847,456 |
| 8-31-00 | 1,084,112 | (198,081) | (67,107) | 818,924 |
| 9-30-00 | 1,103,525 | (185,175) | (70,772) | 847,578 |
| 10-31-00 | 887,529 | (177,028) | (70,772) | 639,729 |
| 11-30-00 | 829,936 | (169,602) | (70,772) | 589,562 |
| 12-31-00 | 731,886 | (139,730) | (70,772) | 521,384 |
| 1-31-01 | 682,425 | (101,099) | (89,964) | 491,362 |

As described by both experts, the contractual disallowance and doubtful accounts are crucial qualifiers of the net accounts receivable and of pivotal importance in the subsequent litigation. Ms. Frazier's testimony shows how the new ALF market affected these qualifiers.

## III. THE LITIGATION

Following the decision of August 15, 2000, to dissolve LifeMed, LLC, the relationship between the member entities of the LLC deteriorated to the point that on October 12, 2001, ARC LifeMed, Inc., LifeTrust America, Inc. and LifeMed, LLC brought suit against AMC-TN, Inc. alleging breach of contract, breach of fiduciary relationship, negligent representation and fraudulent misrepresentation. It is alleged in the Complaint:

### B. Management

12. ARC-LifeMed and LifeTrust entered into the LifeMed venture with AMC-TN because AMC-TN and its parent Omnicare claimed to have significant expertise in the pharmaceutical business, including pricing, packaging, inventory

management, budgeting and accounting. ARC-LifeMed and LifeTrust did not have the specialized knowledge regarding the pharmacy business that AMC-TN and Omnicare claimed to have, and they reasonably relied on AMC-TN's advice as to these matters in connection with AMC-TN's role as a member of LifeMed. AMC-TN owed LifeTrust, ARC-LifeMed and LifeMed a fiduciary duty as a result of its membership interest and specialized knowledge.

13.     Pursuant to the LLC Agreement, ARC-LifeMed, LifeTrust and AMC-TN ratified the existing management agreement, dated June 11, 1997 (the "Management Agreement") between LifeMed and AMC-TN. Pursuant to the Management Agreement, AMC-TN was to manage the day-to-day affairs of LifeMed and provide other services as required therein such as: (a) management of bank accounts, (b) marketing efforts, (c) preparation of budgets, and (d) bookkeeping and accounting. The Management Agreement states that it is to be governed by and construed in accordance with Tennessee law. A copy of the Management Agreement is attached as Exhibit B.

14.     Pursuant to the LLC Agreement, AMC-TN was directly and primarily responsible for the preparation of budgets, maintaining books and records, and performing other accounting functions.

## C.  AMC-TN's Mismanagement And Its Discovery

15.     In August 2000, the LifeMed board voted to cease operations and dissolve LifeMed. However, as of this date, LifeTrust and ARC-LifeMed have not received any distributions of their contributions to the Capital Account or an accounting.

16.     At all times between October 29, 1998 to January 30, 2001, AMC-TN assured LifeTrust and ARC-LifeMed that LifeTrust that their Initial Capital Contributions were safe.

17.     On January 30, 2001, the LifeMed board members met. At that meeting AMC-TN and/or Omnicare representatives presented updated financials for LifeMed through January 2001, and ARC-LifeMed's and LifeTrust's representatives questioned why LifeMed was still trying to wind down the accounting five months after the LifeMed board voted to cease operations.

18.     At the January 30, 2001, Meeting ARC-LifeMed and LifeTrust learned the following information:

-13-

A. AMC-TN never reserved against accounts receivable balances since inception of the business, while failing to timely, properly manage receivables.

B. AMC-TN never properly charged cost of goods sold to LifeMed since its inception. AMC-TN never performed physical inventories. It appears that inventory was stolen or misused by the parent pharmacy, not billed for or expired or was discarded. AMC-TN never alerted LifeTrust or ARC-LifeMed until January 30, 2001 that the inventory had been overvalued by $400,000. Incidentally, the manager of the parent pharmacy also told LifeTrust and ARC-LifeMed at that January 30 meeting that she experienced an inventory shrinkage of close to $500,000 separate and apart from the PIP (pharmacy in pharmacy) shrinkage. Evidently, AMC-TN staffed the parent pharmacy and the PIP with a grossly inadequate manager and failed to provide proper accounting and financial controls to the extreme detriment of the PIP and LifeMed.

C. AMC-TN regularly produced misleading financial statements for LifeTrust and ARC-LifeMed. For example, on January 30, 2001, Omnicare's regional controller provided to ARC income statements and balance sheets for each month of 2000 and for January 2001, which presents accounts receivable and inventory figures unadjusted and incorrect.

19. As a result of the above-reference misrepresentations and wrongful actions and omissions: (a) LifeTrust and ARC-LifeMed received materially inaccurate financial statements from AMC-TN; (b) LifeMed was unable to properly price the goods and services provided, resulting in cumulative losses; (c) the PIP was permitted to own its own inventory, which was detrimental to LifeTrust, ARC-Lifemed and LifeMed and ultimately hid the poor financial results of LifeMed; and (d) LifeTrust and ARC-LifeMed were unable to understand the cumulative poor financial condition which caused ARC-LifeMed and LifeTrust to continue their participation in the losing business longer than would otherwise have been the case.

. . .

23. AMC-TN and LifeTrust have asked for (a) a dissolution of LifeMed, (b) an accounting, and (c) and a return of their funds held in the Capital Account, but AMC-TN has failed to wind up the affairs of LifeMed, provide an adequate an (sic) accurate accounting and pay the amounts requested.

-14-

Plaintiffs then sought *inter alia*, the following:

     A.    Require AMC-TN to provide a thorough accounting of the assets and liabilities of LifeMed, including (1) a complete explanation of the current assets and liabilities of LifeMed, (2) a complete history of the receipt of funds and other property and the disposition of funds and other property, and (3) an explanation as to the status and whereabouts of the Capital Account and LifeTrust's and ARC-LifeMed's Initial Capital Contributions.

     B.    Order a dissolution, winding up and distribution of the assets of LifeMed in accordance with the LLC Agreement and applicable law;

     C.   Order that AMC-TN shall not be allowed to (1) receive any money from the distribution of the assets of LifeMed until ARC-LifeMed and LifeTrust are compensated for their contributions to LifeMed, including interest; or (2) otherwise receive any distribution from the assets of LifeMed as the result of its wrongful acts and omissions.

     D.    To the extent that LifeTrust and ARC-LifeMed are not made whole from the distribution from LifeMed, award a judgment in favor of LifeTrust and ARC-LifeMed against AMC-TN for such amounts together with interest to make them whole from their investments;

     E.   In addition, award LifeTrust, ARC-LifeMed and/or LifeMed judgments against AMC-TN for all direct, consequential and punitive damages arising from AMC-TN's fraudulent and/or negligent misrepresentations, wrongful conduct, breach of fiduciary duty and breach of contract, lack of good faith and gross negligence.

     F.   Award Plaintiffs their attorneys fees and expenses incurred in this action.

     G.    Grant such additional relief as is appropriate under equity or is otherwise appropriate.

AMC-TN answered the Complaint with general denials and with a counter claim for payment by LifeMed, LLC of unpaid management fees allegedly due under the Management Agreement.

It is first necessary to consider the standing and status of LifeMed, LLC as a party to the litigation. In the Complaint of October 12, 2001, LifeMed, LLC is averred to be a party plaintiff, and the body of the Complaint contains the following allegations with regard to the status of the LLC:

     3.    Plaintiff LifeMed, LLC ("LifeMed") is a limited liability corporation organized under the laws of Delaware. At all times relevant to this lawsuit,

-15-

LifeMed's principal offices were located in Hermitage, Davidson County, Tennessee. Upon information and belief, LifeMed is no longer transacting business in this state, and its certificate of authority has been revoked by the Tennessee Secretary of State. As is more fully-set forth below, LifeMed was formed to provide pharmacy services in assisted living facilities.

. . .

6.     ARC-LifeMed, LifeTrust and AMC-TN are the members of LifeMed. ARC-LifeMed and LifeTrust have assented to LifeMed's filing the claims contained herein in its own name.  In the event that LifeMed cannot bring this action because of some refusal of AMC-TN to consent or take some other action, LifeTrust and ARC-TN assert claims on behalf of LifeMed because it is unlikely that AMC-TN would consent to being sued by LifeMed.  Moreover, to the extent that LifeMed's corporate existence has ceased or it is otherwise unable to bring this action in its own name, LifeTrust and ARC-LifeMed assert claims which would otherwise be brought by LifeMed based on the harm to their membership interests in LifeMed.

. . .

26.     Based on the foregoing, AMC-TN has breached its duties under the LLC Agreement and/or Management Agreement, including its duty of good faith and fair dealing.  LifeMed, ARC-TN, and LifeTrust were harmed as the proximate result of such breach.

When the defendant, AMC-TN, Inc., answered the Complaint, it asserted:

3.     AMC-TN denies that LifeMed is a limited liability "corporation." AMC-TN admits the remaining allegations of paragraph 3 of the Complaint except that the Tennessee Secretary of State has reinstated the certificate of authority for LifeMed, LLC.

As an affirmative defense, AMC-TN asserted:

29.     AMC-TN states that LifeMed, LLC is not a proper plaintiff in this action and that Plaintiffs ARC LifeMed, Inc. and LifeTrust America, Inc. are not authorized to bring this action on behalf of LifeMed, LLC without the consent of all members and/or an affirmative vote of all Board of Managers of LifeMed, LLC.

In its counterclaim, AMC-TN, Inc. joins ARC-MedLife, Inc., LifeTrust America, Inc. and LifeMed, LLC as counter defendants.  AMC-TN, Inc. then alleges:

4. Counter-Defendant LifeMed, LLC ("LifeMed") is a limited liability company organized and existing pursuant to the laws of the State of Delaware. LifeMed is qualified to do business in Tennessee and, at all times material to the allegations in this Counter-Claim, maintained a business office in Davidson County, Tennessee.

The Counter Complaint then alleges breach of contract by LifeMed, LLC in its failure to pay management fees allegedly due and owing to AMC-TN. By way of relief, the counter plaintiff seeks:

A. The award of judgments in favor of Counter-Plaintiff AMC-Tennessee, Inc. against Counter-Defendants ARC LifeMed, Inc., LifeTrust America, Inc. and/or LifeMed, LLC, for all damages arising from LifeMed's breach of contract and the Counter-Defendants' unjust enrichment and/or quantum meruit;

When the counter-defendants answered the counterclaim, they answered all the paragraphs in the combined answer and Counterclaim of AMC-TN, Inc. which were set forth numerically first in the answer and then in the affirmative defenses and the Counterclaim itself. Pertinent to the standing and status problem in the answer to the Counterclaim, it is asserted:

. . . 3. Counter-defendants Admit the Allegations in Paragraph 3 of the Counterclaim.

All other relevant allegations of the Counter-complaint are met with a general denial.

Taking the pleadings as a whole, it appears that in the Complaint, the plaintiffs did not know the status of LifeMed, LLC and asserted in effect a possible termination of the LLC under Tennessee Code Annotated section 48-245-701 and alternatively sought to pursue the action under Tennessee Code Annotated section 48-245-1201.[1]

When the defendants asserted their answer to the Complaint, they affirmatively asserted that ". . . the Tennessee Secretary of State has reinstated the certificate of authority for LifeMed, LLC." In its Counter-complaint, AMC-TN affirmatively asserted that LifeMed, LLC was a limited liability company organized and existing under the laws of Delaware and qualified to do business in the state of Tennessee. In the answer of the plaintiffs/counter-defendants to the Counterclaim, they admitted the allegation of the continued existence of LifeMed, LLC. The pleadings themselves establish the continued existence of LifeMed, LLC, and both the Complaint and the Counter-complaint draw issues between LifeMed, LLC and AMC-TN. Even if a termination of LifeMed, LLC had actually occurred, both the Complaint and Counter-complaint are properly before the Court under Tennessee Code Annotated section 48-245-1201.

---

[1]Right to sue or defend after termination period – – after an LLC has been terminated, any of its former managers, governors, or members may assert or defend, in the name of the LLC any claims by or against the LLC. Tenn. Code Ann. § 48-245-1201.

This is essentially a breach of contract case. LifeMed, LLC seeks recovery from AMC-TN for the member manager's failure to perform its contractual duties with particular emphasis on AMC-TN's failure to provide financial reports consistent with generally accepted accounting principles. In this respect, the case involved a dual of expert witnesses. Both Brian Richardson, chief financial officer of ARC, and John Gould, chief financial officer for AMC-TN, were "in-house" experts rather than independent accountants. This dual ended when the trial court accepted the testimony of Mr. Richardson in preference to that of Mr. Gould. In this kind of a credibility call, the judgment of the trial court carries with it great weight in the appellate courts. *Mitchell v. Archibald*, 971 S.W.2d 25, 29-30 (Tenn.Ct.App.1998). It is well to observe that the position of Mr. Gould was seriously compromised by the fact that he did not take over the financial affairs of AMC-TN under the Management Contract until the time that the decision was made in August of 2000 to dissolve LifeMed, LLC. Most of the management problems had already occurred before he was in a position of responsibility. John Gould assumed command of this Titanic only after it struck the iceberg.

Three major areas are involved in the breach of contract: (1) the "cost generator" used in measuring inventory was grossly in error; (2) AMC-TN did not collect its fee and expenses contemporaneously with earning such fees and incurring such expenses as required by the management contract; (3) AMC-TN grossly understated reserves for bad accounts. The trial judge accepted Mr. Richardson's testimony, holding that AMC-TN had breached its Management Contract with respect to deficient control of inventories, failure to timely collect its fees and expenses and maintaining grossly inadequate reserves for bad debts, and the evidence supports these findings.

After realizing the bookkeeping and accounting problems of LifeMed, Gould commiserated with Pat Keefe of Omnicare by memo of January 11, 2001. In considering this memo, certain observations are necessary.

1. What is referred to as "Stephen's J.V." is in fact LifeMed, LLC. What is referred to as "Stephens" is AMC-TN (The Pharmacy) in its status independent of the LifeMed, LLC venture.

2. The criticisms by Gould, deal primarily with matters predating his arrival on the scene.

3. AMC-TN is, and has been since the joint venture began, a single entity. It cannot divide itself into component parts and disavow the pre-Gould era.

4. The memo is dated five months after the decision to dissolve the joint venture, four months after the projected date of the dissolution and 19 days prior to the January 30, 2001, meeting of the joint venture board.

At the outset, the memo provides:

The following represents key financial accounts and balances as of November 30, 2000:

| | |
|---|---|
| Cash | $553,107 |
| Net A/r | 596,864 |
| Inventory | 557,149 |
| Net P, p&c | 72,080 |
| Net Goodwill | 238,492 |
| A/p | 1,138,847 |
| Member Equity | 897,249 |

The balances above were as of November 30. I am currently in the process of reconciling several accounts including cash, inventory, accounts payable and member's equity. With the exception of inventory, due to the lack of paper trail, I am having trouble reconciling these accounts. The following is being taken into consideration before the final balance sheet is calculated.

. . .

Accounts Payable

Of the $1,138,000 balance, $1,110,000 is owed to Stephens pharmacy for service performed and inventory purchased. The problem is Stephens has an account receivable balance for the J.V. of $1,231,904 for a difference of $117,788. As mentioned above the lack of paper trail for 1997-1999 is making it difficult to reconcile this balance.

Thus, it appears that as of November 30, 2000, joint venture carried $1,110,000 in accounts payable to AMC-TN, not only for inventory purchased but for "service performed." Nothing in the periodic accountings and balance sheets supplied to LifeMed, LLC discloses that AMC-TN had not been collecting for its "service performed" as it is required to do under paragraph B of the Management Agreement. It is also difficult to see how AMC-TN, in its capacity as manager of LifeMed, LLC, can carry accounts payables to AMC-TN of $1,110,000 while simultaneously carrying on its own books accounts receivable from the joint venture of $1,231,904.

The memo next addresses inventory and reveals in stark fashion the shortcomings of AMC-TN's management of inventory.

Inventory

The J.V. started carrying inventory effective January 1, 2000. Prior to that, an inventory amount equal to the cost generator percent was transferred from Stephens' books to the J.V. The J.V. recorded this as cost of goods sold. Under this scenario, whenever an inventory was taken any gain or loss was recorded on Stephens' books. In the last 6 months of 1999, Stephens recorded an inventory loss of $450,000, none of which was recorded by the J.V.

Even though inventory was purchased separately by Stephens and the J.V. starting in 2000, all physical counts were combined and compared to the combined book total for both companies. The reason for this was there was still a significant amount of inventory that was shared by both companies that was not properly being tracked. By combining the two inventories a total gain or loss could be calculated with the difference usually being shared.

On September 15, a physical inventory was taken and a combined loss of $133,000 was noted. Depending on how the reconciliation of the accounts payable/account receivable balances are resolved (as noted above) this loss could reach $260,000. As it stands on the books for each company, Stephens has a gain of $260,000 (or $133,000 gain if the reconciliation of a/r is unfavorable to Stephens) on a physical count of $784,588 and the J.V. had a loss of $393,000 on a count of $226,270.

The kicker to the September 15 physical is that throughout the month, Stephens would borrow inventory from the J.V. This inventory was supposed to be tracked so that an entry could be made to record the transfer. The last transfer recorded was May 2000. The amount of the unrecorded transfer is approximently [sic] $400,000. If this transfer were to be recorded, Stephens would have a loss at September 15, of $140,000 (or $267,000 depending on how the a/r reconciliation is resolved) and the J.V. would have a gain of approx. $10K.

Another thing to note, the November 30 inventory for Stephens yielded a gain of $260,000. However, this is before the $400,000 transfer and Stephens purchase of J.V. inventory (the amount has yet to be determined). If the transfer were to be recorded the $260,000 gain would become a $140,000 loss. If the transfer were to be made, the J.V. would have an inventory balance of $220,000 that Stephens would have to purchase. Therefore the loss at 11/30 on Stephens books would be $360,000.

Mr. Gould next addresses accounts receivable and makes his candid appraisal of the situation facing the joint venture as of the end of December 2000.

An additional $80,000 was collected in December. Therefore the net a/r balance is approximently (sic) $517,000. My conservative estimate is that we will be lucky to see $200,000 more in collections. Because of how the books were kept early on in the J.V., I am not convinced that there is even $517,000 to collect. Of the $517,000 left to collect, $200,000 is unbilled third party insurance. This is the amount we are trying to collect.

In testimony at trial, Bryan Richardson discussed the requirements of generally accepted accounting principles as to reserves against bad accounts:

[T]here's two tests as far as when you would set up a reserve: When something is probable that it will be a loss contingency; and when you can estimate it. And then there's some specific guidance on accounts receivable that talks very specifically about the fact that this is – – you're literally looking at the receivables as a whole.

In other words, the fact that at any point in time you can't say, well, I'm not sure that this persons' going to pay me or this person's going to pay me but that you would look at the whole pool of receivables that you have, you would look at the historical trends in your business and the fact that, on average, X percentage of people don't pay you, that you would be needing to use that kind of guidance as far as setting up reserves.

So the fact at any point in time you may not be able to point specifically at which receivable are going to go bad, the guidance is very clear that that is not a defense, that you need to look at historical trends and look at your estimates and set up reserves accordingly.

As a matter of fact, one of the things that I – – that's what I've mentioned in my write-up as far as, you know, the need to continually assess that based on the trends. One of the items that I received as a response to my report was some information from John Gould entitled Response to Bryan Richardson's Analysis of LifeMed's Accounts Receivable and Collection Records. And in that he's talking about in most cases a receivable balance will not be reserved until it is positively determined that no other course of action can be taken or that it is highly probable it will not be collected. Again, in our business this could take up to a year of more to make that determination.

That's directly in contradiction to what GAAP [Generally Accepted Accounting Principles] tells you you need to do. GAAP is saying you can't wait until you positively know something is going to be not collectible that you need to make a reasonable estimate, and it allows you to update that estimate from time to time as you have more facts and circumstances. But the response that John made to my memorandum is directly in contradiction to what GAAP tells you you need to do.

And then it further goes on to say – – and, again, this is John's response to my memo. It says, "It's easy to conclude today that two and a half years ago LifeMed's reserves were understated, hindsight is 20/20. However, I disagree that two and a half years ago this conclusion was that evident." This is, again, admitting that as you look back, certainly those reserves were understated but not, I guess, recognizing the responsibility to have set aside an appropriate reserve at that time.

Mr. Richardson's report provided:

6) The total amounts recorded on the LifeMed financial statements as of 9/30/00 were:

| | |
|---|---|
| Accounts Receivable | $1,110,777 |
| Allowance for doubtful accounts | (70,772) |
| Contractual Allowances | (185,175) |
| Net Accounts Receivable | $854,830 |

7) Based on the information provided, it appears that the Allowance for Doubtful Accounts reserve balance as of 9/30/00 should have been at least $380,000.

Overall Conclusions

In my opinion, based on the information reviewed, the Allowance for Doubtful Accounts as of 9/30/00, should have been at least $380,000. The significant balances beyond terms, lack of effective collection activity, billing difficulties, and other information and trends should have indicated a need for a larger reserve balance than was shown on the financial statements.

Based on the $380,000, the reserve balance at 9/30/00 of $70,772 was understated by $309,228. Based on my review, I believe the reserve balance as recorded on the LifeMed financial statements was materially understated throughout 1999 and 2000.

One cannot help but note the parallel between Mr. Richardson's analysis of accounts receivable reserves and the candid observations of John Gould in his memo of January 11, 2001. Under both analyses, the collectibility of the net accounts receivable reflected on the AMC-TN prepared balance sheets for the joint venture are clearly and strictly limited.

The trial court held:

> As a result of the improper financial statements, the joint venture probably continued longer than it would have by AMC-Tennessee advancing monies for expenses and not properly taking them out of the checking account set up for the joint venture. The members of the joint venture were deprived of how serious the joint venture was running into the red.
>
> If this process that had been set up in the management agreement had been followed rather than AMC-Tennessee financing some of the expenses through their accounts rather than the checking accounts set up and approved by the board of managers, it would have become very evident earlier on as to what problems were being incurred in the operation of the joint venture.
>
> I cannot precisely point to what financial problems started when, whether the billing of the communities' residents and nonpayment caused a lack of

-22-

cash flow. I don't know if the purchase of pharmaceuticals by AMC-Tennessee as the PIP, pharmacy in a pharmacy, operator caused them to have expenses that they carried which were not reimbursed, but it is apparent from all the testimony that the $400,000 write-off occurred over a period of time that would have been evident if all of the bookkeeping and accounting procedures that were set out in the management agreement had been followed.

It was incumbent upon AMC-Tennessee, Inc., to keep the books and to prepare proper financial statements and records. That included preparing proper financial statements in August of 2000 and in January 2001. Those financial statements were not properly prepared, and AMC-Tennessee, Inc., breached its duties under the management agreement both with regards to the payment of expenses to be paid at the joint venture's expense by checks drawn on the joint venture's accounts and by failing to maintain proper bookkeeping and accounting procedures and proper preparation of financial statements and records.

The evidence sustains these findings of the trial court that AMC-TN materially breached the Management Agreement to the detriment of LifeMed, LLC. As a result of the materially inaccurate financial statements issued by AMC-TN to LifeMed, LLC, the joint venture asserts that it was unable to properly price the goods and services provided, and that this inability resulted in cumulative losses. By withholding the inventory shortages and failing to disclose that its fees and expenses were accumulating rather than being contemporaneously paid in the manner required by the Management Agreement and by overvaluing accounts receivable, AMC-TN provided a false picture of the true financial condition of the joint venture and the degree to which losses were accumulating. It matters not whether the motivations of AMC-TN were altruistic or self-servingly deceptive. If the true financial picture would have caused LifeMed, LLC to price its products out of the market, such is not a decision to be made by the manager under the Management Agreement. Among the responsibilities of the owner, as provided by the Management Agreement, are:

A. Operational Policies. The board of managers of the owner shall develop and implement all operational policies and procedures necessary to establish and maintain the standard of pharmacy services appropriate for the nature of The Pharmacy.

B. Charges. The board of managers of the owner shall establish the scheduled or recommended charges for pharmaceutical products and services provided by The Pharmacy.

Instead of giving the board of managers of LifeMed, LLC the information upon which it could make decisions as to the pricing of products, or for that matter, the continued existence of the joint venture, the managing member withheld such information and appropriated to itself a right to make unilateral decisions for the joint venture. This was clearly in breach of the Management Agreement.

-23-

## IV. FIDUCIARY DUTY AND NEGLIGENT MISREPRESENTATION

Both breach of fiduciary duty and negligent misrepresentation fail as causes of action under the facts of this case for reasons set forth in *McGee v. Best*, 106 S.W.3d 48 (Tenn.Ct.App.2002).

In *McGee*, a terminated member of the LLC filed suit against the LLC and its other members charging *inter alia*, breach of contract, breach of fiduciary duty and misrepresentation. In affirming the trial court's rejection of the breach of fiduciary duty claim, this Court held:

> The plaintiff argues that the trial court erroneously held that the plaintiff's claims based upon an alleged breach of fiduciary duty owed to him individually by the other members must fail as a matter of law because there is no fiduciary duty between, or among, individual members of a Limited Liability Corporation. We disagree. Tenn.Code Ann. § 48-240-102(a)(2002) provides:

> > (a) FIDUCIARY DUTY OF MEMBERS OF MEMBER MANAGED LLC. Except as provided in the articles or operating agreement, every member of a member-managed LLC must account to the LLC for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the formation, conduct, or liquidation of the LLC or from any use by the member of its property including, but not limited to, confidential or proprietary information of the LLC or other matters entrusted to the member as a result of such person's status as a member.

> > (b) STANDARD OF CONDUCT. A member of a member-managed LLC shall discharge such member's duties as a member, including all duties as a member of a committee:
> > (1) In good faith;
> > (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
> > (3) In a manner the member reasonably believes to be in the best interest of the LLC.

*Id.*

> The rule of statutory construction to which all others must yield is that the intention of the legislature must prevail. *Mangrum v. Owens*, 917 S.W.2d 244, 246 (Tenn.Ct.App.1995)(citing *Plough, Inc. v. Premier Pneumatics, Inc.*, 660 S.W.2d 495, 498 (Tenn.Ct.App.1983); *City of Humboldt v. Morris*, 579 S.W.2d 860, 863 (Tenn.Ct.App.1978)). "[L]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, when read in the context

of the entire statute, without any forced or subtle construction to limit or extend the import of the language." *Mangrum v. Owens*, 917 S.W.2d at 246; (quoting *Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn.1977)). The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant. The Court must give effect to every word, phrase, clause, and sentence of the Act in order to achieve the Legislature's intent, and it must construe a statute so that no section will destroy another. *Id.* (citing *City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn.Ct.App.1983); *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn.1975)).

The statute in question defines the fiduciary duty of members of a member-managed LLC as one owing to the LLC, not to individual members. We cannot contravene the intent of the Legislature. Therefore, we find that the trial court correctly dismissed the plaintiff's cause of action for breach of fiduciary duty.

*McGee v. Best*, 106 S.W.3d at 63-64.

In *Anderson, et al. v. Wilder, et al.*, E2003-00460-COA-R3-CV, 2003 WL 22768666 (Tenn.Ct.App.), this Court distinguished the rule in *McGee* and, adapting partnership and closely-held corporation principles, imposed a fiduciary relationship upon a majority shareholder of an LLC in his relationship to a minority shareholder. *McGee* was distinguished by the Court because the case involved ". . . 'a rather uncomplicated dispute controlled by the Employment Contract and the Operating Agreement . . . . The only issue involved is whether termination of the employment was for cause.' *McGee*, 106 S.W.3d at 67." *Anderson*, 2003 WL 22768666 at *6. The case at bar likewise involves uncomplicated contractual duties under an operating agreement and a management agreement and not a factual situation involving oppression by a majority shareholder of minority shareholders.

The parties do not dispute the existence of a fiduciary duty owed by the managing member of the LLC to the LLC. In addition, all of the factual allegations of the Complaint constitute repeated breaches of the Management Contract between the managing member and the LLC resulting in damages to the LLC. Thus, the question whether or not a fiduciary duty is owed by the managing member to the other members is of little consequence under the facts of this case. Plaintiffs have asserted no damages to themselves personally, but only such damages as necessarily flow from breach of the Management Contract with LifeMed, LLC.

As to alleged negligent misrepresentation, it is noted that the only misrepresentations asserted are the same misrepresentations as constitute the breach of contract asserted by LifeMed, LLC. No assertions of individual damages accruing to ARC or LifeTrust are made independent of damages recoverable by the LLC other than general allegations asserting compensatory and punitive damages to the members, which are supported by no proof. Once again, *McGee* is instructive.

As the trial court pointed out, "the plaintiff alleges that certain information was withheld from him-either intentionally or negligently – and that this information was material in the manner by which he conducted the affairs of the LLC. Plaintiff does not allege that he conducted his own personal affairs in reliance upon any such material information or that he obligated himself personally in reliance thereon." Plaintiff's amended complaint provides in pertinent part:

> 94.    The Plaintiff was relying on statements of employees of IEI to conduct the affairs of MBF & I and these material omissions caused Plaintiff to act in manner that he otherwise would if he had known the true state of affairs thereby damaging him and the LLC.

The plaintiff has, in essence, alleged a derivative claim, but at this point has no standing to bring such a claim. In *Bourne v. Williams*, 633 S.W.2d 469 (Tenn.Ct.App.1981), Judge Tomlin of this Court said:

> It has long been recognized that where a wrong to the corporation was claimed by a stockholder, if the board of directors of the corporation did not take steps to rectify the wrong, then a stockholder could bring the action in the name of the corporation, for the benefit of the corporation. This is the gravamen of a "derivative" suit. 13 Fletcher, Cyc. Corp. sec. 5908 (perm. ed.1980). *See also Opportunity Christian Church v. Washington Water Power Co.*, 136 Wash. 116, 238 P. 641 (1925).

*Bourne v. Williams*, 633 S.W.2d at 471. However, the plaintiff has not proceeded in this manner. Furthermore, the plaintiff's amended complaint also alleges a personal injury as a result of certain information being withheld from him. The plaintiff's personal injury is, in essence, the plaintiff's termination from employment with MBF & I. However, as the trial court noted, "that claim arises out of the employment relationship and does not create a cause of action for fraud or misrepresentation."

*McGee v. Best*, 106 S.W.3d at 65.

Breach of fiduciary duty is an action sounding in tort. *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 795 (Tenn.1996). An action for negligent misrepresentation sounds in tort. *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn.Ct.App.1991). In actions based on ordinary negligence rather than willful conduct, proof of damages is an element of the plaintiff's cause of action and, without such proof offered by ARC and LifeTrust, Inc., their cause of action fails. *Skoretz v. Cowden*, 707 S.W.2d 529, 532 (Tenn.Ct.App.1983); *Morris v. State*, 21 S.W.3d 196, 203 (Tenn.Ct.App.1999); *see also* 22 Am Jur 2d, "Damages" § 16.

The findings of the trial court as to fiduciary duty and negligent misrepresentation are reversed.

## V. COUNTER COMPLAINT

By its counterclaim, AMC-TN seeks recovery of unpaid management fees under the Management Contract and, in the alternative, recovery from LifeMed, LLC because of unjust enrichment or for the value of services in *quantum meruit*.

In this context, as well, the significance of the trial court's acceptance of the testimony of Mr. Richardson over the testimony of Mr. Gould cannot be overemphasized. In addressing this credibility call, we must give deference to the settled rule:

> One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn.1990); *Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn.1989). Accordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *See Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn.1978); *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn.Ct.App.1996).

> The most often cited reason for this principle can be traced to the fact that trial judges, unlike appellate judges, have an opportunity to observe the manner and demeanor of the witnesses while they are testifying. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn.Ct.App.1991). There are, however, other reasons for this principle. As the United States Supreme Court has observed:

>> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

> *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

The advisory committee note to Fed.R.Civ.P. 52(a), which requires that deference be given to the trial judge's opportunity to judge the credibility of witnesses, lists three important policy concerns behind the rule: (1) upholding the legitimacy of the trial courts to litigants; (2) preventing an avalanche of appeals by discouraging appellate retrial of factual issues, and (3) maintaining the allocation of judicial authority. The policy underpinnings of Fed.R.Civ.P. 52(a) advance the public's interests in stability and judicial economy, and we view them as equally important to Tennessee's citizens and courts.

*Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App.1998).

The trial court accepted the expert testimony proffered by the plaintiffs. This testimony established that AMC-TN failed to manage LLC accounts according to generally accepted accounting principles. This failure constituted a material breach of the Management Agreement. A party who has materially breached a contract cannot recover on the contract. Nevertheless, under proper conditions and upon carrying the burden of proof as to the value of services rendered under the contract, he may recover in *quantum meruit*. The rule is:

Even though a contract be entire, the party who breaches the same may recover of the other party, as on a quantum merit, the value of benefits conferred on such other party by partial performance — these benefits being accepted and retained. Any damage, of course, which the party not in default suffered by the breach also to be taken into account. The law is frequently so applied in cases which involve building contracts and contracts for personal services. Stump v. Estill, 7 Tenn. (Peck.) 175; Elliott v. Wilkinson, 16 Tenn. (8 Yerg.) 411; Porter v. Woods, 22 Tenn. (3 Humph.) 56, 39 Am.Dec. 153; Barker v. Reagan, 51 Tenn. (4 Heisk.) 590, 596; Bush v. Jones, 2 Tenn.Ch. 190; Jones v. Jones, 32 Tenn. (2 Swan) 605; Congregation of Children of Israel v. Peres, 42 Tenn. (2 Cold.) 620; Massey v. Taylor, Wood & Co., 45 Tenn. (5 Cold.) 447, 98 Am.Dec. 429; Hunter v. Litterer & Cabler, 60 Tenn. (1 Baxt.) 168; Bruce v. Baxter, 75 Tenn. (7 Lea) 477.

*National Life & Accident Ins. Co. v. Hamilton*, 98 S.W.2d 107, 108 (Tenn.1936).

It is well to observe also that the failure of AMC-TN to timely collect its fees and expenses was itself in material breach of the Management Contract. AMC-TN presents no material evidence as to the value of its services so as to allow for a recovery in *quantum meruit* or any evidence of unjust enrichment. As the trial court held, the counter complaint is without merit.

## VI. DAMAGES

If the "pharmacy-within-a-pharmacy" concept was difficult to administer, the separate remedies sought in this litigation are equally challenging and must be separated in order to be compatible. When breach of fiduciary duty, negligent misrepresentation and the counterclaim

asserting *quantum meruit* and unjust enrichment are removed from the case, we are left with a breach of contract action by LifeMed, LLC against AMC-TN and a counterclaim for breach of contract by AMC-TN against LifeMed, LLC. This Court, having affirmed both the trial court's finding that AMC-TN breached the Management Contract and its dismissal of the counterclaim, now must first address the question of damages resulting to LifeMed, LLC because of the breach.

Equitable considerations cannot intervene in a pure breach of contract action.

"Equity follows the law. Where there is no legal liability, equity can create none." *Henderson v. Overton*, 10 Tenn. 394, 397 (1830); *Bedwell v. Bedwell*, 774 S.W.2d 953, 956 (Tenn.Ct.App.1989); *Metropolitan Life Insurance Company v. Owens*, 246 S.W.2d 971, 972 (Tenn.1952). "When in doubt equity follows the law." *Tennessee-Carolina Mills v. Mauk*, 14 Tenn.App. 517, 519 (1931). What appears to be fair as a matter of equity cannot prevail in the face of constitutional, statutory or contractual provisions governing the rights of the parties. As the Supreme Court of Nevada observed,

> Our equitable powers do not extend so far as to permit us to disregard fundamental principles of the law of contracts, or arbitrarily to force upon parties contractual obligations, terms or conditions which they have not voluntarily assumed. In this regard, equity respects and upholds the fundamental right of the individual to complete freedom to contract or decline to do so, as he conceives to be for his best interests, so long as his contract is not illegal or against public policy. In this respect, and many others, equity follows the law. Much as we would like to relieve the appellant from his unfortunate situation, we cannot rightfully do so, as we must maintain the necessary certainty, stability and integrity of contractual rights and obligations.

*McCall v. Carlson, et al.*, 172 P2d 171, 187-88 (Nev.1946).

Consequently, where the remedies available to a litigant are circumscribed by the boundaries drawn at law, such as in a breach of contract case, principles of equity cannot create rights outside those boundaries. *See generally Swartz v. Atkins*, 315 S.W.2d 393, 395 (Tenn.1958); *Bedwell v. Bedwell*, 774 S.W.2d, at 956. The Missouri Court of Appeals succinctly stated the rule to be applied in breach of contract cases. "The rights of the parties are to be determined from the contracts into which they entered and the consequences of those contracts and not from some generalized concepts of equity." *Norcomo Corp. v. Franchi Construction Co., Inc.*, 587 S.W.2d 311, 317 (Mo.Ct.App. 1979). This Court has held: "The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Custom Built Homes v. G.S. Hinsen Co., Inc.*, 1998 WL 960287 (Tenn.Ct.App. Feb. 2, 1998) (citing *LifeCare Ctrs. Of Am., Inc. v. Charles Town Assoc's. Ltd. Partnership, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir.1996)).

However, the second remedy sought by the Complaint is for the Court to ". . . order a dissolution, winding up and distribution of the assets of LifeMed in accordance with the LLC Agreement and applicable law." This is therefore a proceeding to dissolve an LLC by judicial intervention. In such a proceeding, the court ". . . may grant any equitable relief it considers just and reasonable in the circumstances . . ." Tenn.Code Ann. § 48-245-901.

Determining damages for breach of contract in this case is rendered difficult by the fact that the managing member controlled the books and records of the LLC, wrote all of the checks, recorded all of the income, did all of the bookkeeping, and provided all of the accountings under its Management Contract. Nevertheless, it must abide by the Management Contract.

In addressing the duties of the managing partner of an LLC, it must be recognized that the LLC is still in its relative infancy. This Court has observed:

> The LLC is a relatively new form of business entity, a hybrid which "incorporates certain beneficial aspects of a partnership with certain beneficial aspects of a corporation." Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689. This A.L.R. annotation contains the following helpful observations:

>> It is important to keep the history of LLC development in perspective when working with LLCs and court interpretations of LLC acts. . . . The typical LLC act is usually a hybrid of provisions culled from the individual state's partnership statutes and business corporation law.

>> * * *

>> [W]hen a court is interpreting an LLC act or agreement, the court will focus on the particular aspect of the LLC that gives rise to the problem, with emphasis on the foundational business form from which that characteristic originated. Usually, the particular aspect can be traced to either the corporate components or the partnership components of the LLC act or agreement. In such cases where the characteristic originated from the partnership aspects of the LLC, the court will use the established princip[le]s and precedent of the partnership law to resolve the issue . . . In such cases where the characteristic originated from the corporate aspects of the LLC, the court will utilize the established princip[le]s and precedent of corporate law to resolve the issue. 79 A.L.R. 5th at page 698.

*Anderson, et al. v. Wilder, et al.*, 2003 WL 22768666 * 3-4 (Tenn.Ct.App. Nov. 21, 2003).

-30-

Borrowing from partnership law and under the terms of the Management Contract, LifeMed, LLC was entitled to a proper accounting by its managing partner. *Fulcher v. Allen*, 2 S.W.3d 207, 218 (Tenn.Ct.App.1999).

As held by the Supreme Court of Illinois:

> As the managing partner who was admittedly responsible for virtually all of the financial aspects of the partnership, defendant had a duty, as trustee, to maintain regular and accurate records and to account for partnership transactions. (*Altschuler v. Altschuler* (1951), 410 Ill. 169, 177-78, 196-97, 101 N.E.2d 552; see also *Bakalis v. Bressler* (1953), 1 Ill.2d 72, 78-79, 115 N.E.2d 323. *Einsweiler v. Einsweiler* (1945), 390 Ill. 286, 293, 61 N.E.2d 377; *Wylie v. Bushnell* (1917), 277 Ill. 484, 491, 115 N.E. 618; Ill.Rev.Stat.1981, ch. 106½, pars. 20, 21(1), 22.) All doubts and obscurities created by his own negligent failure to keep adequate records were properly resolved against him by the trial court. *Altschuler v. Altschuler* (1951), 410 Ill. 169, 196-97, 101 N.E.2d 552; *Crimp v. First Union Trust & Savings Bank* (1933), 352 Ill. 93, 102, 185 N.E. 179; *Crane & Bromberg, Partnership* sec. 66, at 384 (1968).

*Couri v. Couri*, 447 N.E.2d 334, 337 (Ill.1983); *see also Glazer v. Kurman*, 120 A.2d 892, 894 (Penn.1956).

The breach of contract by AMC-TN has been plainly established and the difficulties in establishing damages are caused by the inaccurate accountings made by AMC-TN, the misstatement of LifeMed, LLC's true financial condition, and the failure to manage the LLC's business in accordance with the requirements of the Management Contract.

> The courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties. "Exact justice is not always attained, and the law does not require exactness of computation in suits that involve questions of damages growing out of contract of tort." [sic] *Provident Life and Accident Ins. Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057 (1928). In *Coverdell v. Mid-South Farm Equipment Assoc., Inc.*, 335 F.2d 9 (6th Cir.1964), the court applied Tennessee law to determine that an insurance company agent who was informed by trustees of the defendant corporation that he had been hired under a personal service contract to organize their group insurance, worked an entire weekend on the project, and cancelled an appointment in Texas was damaged when the trustees gave the contract to another agent. Uncertain and speculative damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain. When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required. *Id.* at 14.

*Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn.Ct.App.1983).

From a review of the record in this case, it would appear that the shortages in inventory within the "pharmacy-within-a-pharmacy" may not have resulted in substantial losses to LifeMed, LLC since AMC-TN, independently of the joint venture, appears to have chosen to absorb these losses. The real damages occur from the failure of AMC-TN to timely collect its expenses and management fees in the amount of $538,151, which was clearly in breach of the contract. It further appears that the overvaluation of accounts receivable was approximately $380,000. These damage amounts appear to be recoverable by LifeMed, LLC from AMC-TN.

Since the trial court determined the case on the basis of breach of fiduciary duty, negligent misrepresentation, and breach of contract, and this Court has sustained the action only on breach of contract in favor of LifeMed, LLC only, review of the trial court's findings is somewhat complicated. The final judgment of the trial court provided:

> 33. Damages are difficult to calculate in this case due to the state of LifeMed's books. The Court is guided through the end stages of the limited liability company's life somewhat by partnership principles. *See Harwitz v. Padden*, 581 N.W.2d 359, 362 (Minn. Ct. App. 1998). In particular, all doubts regarding the division of the firm's remaining assets well be resolved against the member responsible for haphazard and misleading accounting practices. *See, e.g., Wilson v. Moline*, 38 N.W.2d 201, 207 (Minn. 1949).

> 34. On this standard, the Court has little difficulty concluding that LifeTrust and ARC-LifeMed have been damaged to the extent of their initial capital contributions of $200,000 and $300,000, respectively. The record contains abundant evidence that these members would have voted to dissolve the limited liability company upon learning that their equity was in danger.

> 35. The record reflects that LifeMed presently has available cash of $686,439.00 and is subject to a third-party property tax claim of $1,135.00. The tax claim shall be paid from the available cash. Thereafter, the non-managing members capital contributions shall be returned to them. After return of the non-managing members' capital contributions and payment of the taxes, the limited liability company is left with $185,304.00. The Court holds that AMC-TN is entitled to a return of its actual capital contribution of $150,000 from this sum. The remaining $35,304.00 is to be divided pro rata among the parties according to their initial capital contributions. Although the LLC Agreement provides for the parties to divide LifeMed assets equally, AMC-TN itself has proposed a pro rata distribution (Ex. 39), and the Court concludes that such a distribution is more equitable in light of AMC-TN's conduct. Thus, the parties shall receive in addition to their capital contributions:

| LifeTrust: | $10,862.77 |
| ARC-LifeMed | 16,294.15 |
| AMC-TN | 8,147.08 |

36.     It is also represented that there are hard assets consisting primarily of medical carts which belong to the joint venture. The Court has heard no credible evidence regarding the value of those carts. In view of the fact that the carts are depreciating assets, the Court concludes that the time and expense required to determine their value and ownership would not be warranted from a cost-benefit standpoint. Accordingly, the carts shall be awarded and remain in the possession of whichever party currently has them.

37.     It is also represented that there is a (sic) outstanding account payable of approximately $25,000 owed by the plaintiff LifeTrust to the defendant joint venture LifeMed. The only testimony offered on this subject was the testimony of Ms. Frazier, unsupported by any documentation. A representative of LifeTrust disputes the payable. The Court concludes that there is insufficient evidence to support the existence of the alleged payable and makes no findings as to the merit of that claim.

38.     At the suggestion of the plaintiffs, the uncollected accounts receivable remaining on LifeMed's books, estimated by AMC-TN to be approximately $200,000.00 are awarded to AMC-TN. The defendant shall benefit from any collection efforts it cares to make.

As can readily be seen, the trial court holds that AMC-TN has materially breached the contract to the detriment of LifeMed, LLC, but does not make an award of compensatory damages before proceeding to a judicial distribution of net assets in conformity with the prayer of the Complaint for judicial dissolution of LifeMed, LLC.

The primary relief sought in the Complaint was "To the extent that LifeTrust and ARC-LifeMed are not made whole from the distribution from LifeMed, award a judgment in favor of LifeTrust and ARC-LifeMed against AMC-TN for such amounts together with interest to make them whole from their investments."

The holding of the trial court results in fulfillment of the primary relief sought by LifeTrust and ARC-LifeMed. While the proof as to the failure to collect timely fees and expenses and the overvaluation of accounts receivable might, upon close analysis, sustain damages more or less in favor of LifeMed, LLC than the judgment of the trial court ultimately determined in the distribution made upon dissolution, we are content with the result reached by the trial court, which is in effect a judgment for LifeMed, LLC in the amount of $538,151. This is the exact amount of the expense and management fees not timely collected by AMC-TN in breach of the Management Contract and the amount disallowed as a claim against LifeMed, LLC in the counter complaint of AMC-TN. This

recovery for breach of contract would leave, in the hands of LifeMed, LLC, the approximate $675,000 equitably divided by the court in its ultimate distribution to the three joint venturers under the Decree of Dissolution fashioned by the trial judge. The end result is that LifeMed, LLC is absolved in the breach of contract claim of $538,151 claimed by AMC-TN as management fees. Therefore, in the equitable distribution on dissolution of the LLC, each of the LifeMed, LLC members receives its initial contribution plus a pro rata share of anything left, which is after all the primary relief sought in this first place. For reasons stated, we affirm the judgment of the trial court with respect to all issues involving breach of contract and, on the basis stated herein, damages and dissolution distribution.

## VI. PREJUDGMENT INTEREST

All parties in this action were hampered by the paucity of case law providing guidance relative to limited liability companies which have existed for barely a decade in Tennessee. The trial court has found no intentional wrongdoing on the part of AMC-TN, and we agree with that finding. While the breach of contract by AMC-TN resulted in damages to LifeMed, LLC, the record reveals clearly that such breach of contract was not the only causative factor in the failure of LifeMed, LLC. All of the members overestimated the participation that they could achieve in the assisted living facilities which depended not upon the singular judgment of the particular assisted living facility, but rather the voluntary participation of individual residents. AMC-TN has prevailed on appeal on all issues except the breach of contract. Applying the principles in *Myint v. Allstate Insurance Co.*, 970 S.W.2d 920 (Tenn.1998), we have determined that LifeMed, LLC is not entitled to prejudgment interest.

The judgment of the trial court as to breach of fiduciary duty and negligent misrepresentation is reversed. The judgment of the trial court as to the award of prejudgment interest is reversed. In all other respects, the judgment of the trial court as modified herein is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary.

Costs of appeal are assessed against AMC-TN.

_____
WILLIAM B. CAIN, JUDGE

-34-