IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2019 Session

## ALEXANDER J. BYNUM, ET AL. v. MARK D. SAMPSON, ET AL.

**Appeal from the Chancery Court for Weakley County
No. 23156     W. Michael Maloan, Chancellor**

---

**No. W2019-00188-COA-R3-CV**

---

This appeal concerns an alleged breach of contract. Alexander Bynum and his father, Hal Bynum, ("the Bynums," collectively) bought a slaughterhouse owned by Mark D. Sampson ("Defendant") and his then-wife Kimberly Sampson ("the Sampsons," collectively) and kept it running as Southern Chop Shop, LLC.[1] The contract for sale provided that all plumbing systems would be in working order on the day of closing. A year after closing, the Bynums discovered a pipe on the property that was gushing animal blood straight from the kill floor of the slaughterhouse into a ditch. Defendant knew about but had not disclosed the pipe. The State became involved and demanded a halt to the discharge. When remedial efforts proved economically unfeasible, the Bynums shut down the slaughterhouse. The Bynums and Southern Chop Shop, LLC ("Plaintiffs," collectively) sued the Sampsons for breach of contract in the Chancery Court for Weakley County ("the Trial Court"). The Trial Court found for Plaintiffs, ordering rescission or, if that is not possible, a monetary judgment against the Sampsons. Defendant appealed and argues that the plumbing system was in working order on the day of closing notwithstanding the blood-gushing pipe. We disagree and find that, contrary to the representations made by Defendant and relied upon by the Bynums, the plumbing system was not in working order on the day of closing. Defendant, therefore, breached the contract. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J., and ROBERT E. LEE DAVIES, SR. J., joined.

---

[1] Kimberly Goode—formerly Kimberly Sampson—did not appeal. She did, however, file notice of bankruptcy in this Court after oral arguments. At the hearing on damages below, counsel for Ms. Goode represented that his client was undergoing Chapter 13 bankruptcy. Counsel stated further: "I do have an order from the bankruptcy trustee -- or from the bankruptcy court, allowing me to continue to represent her until the conclusion of this matter." Discerning no obstacles to deciding this appeal, we proceed.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Mark D. Sampson.

Keely N. Wilson and Matthew R. Courtner, Jackson, Tennessee, for the appellees, Alexander J. Bynum, Hal Bynum, and Southern Chop Shop, LLC.

## OPINION

## <u>Background</u>

Alexander Bynum, a realtor, partnered with his father, Hal Bynum, to purchase Sharon Food Locker, a slaughterhouse built in the 1970s, from the Sampsons for $235,000. Hal Bynum provided the funds for the purchase. The Bynums intended to keep the business going under the new name Southern Chop Shop, LLC. Alexander Bynum prepared the contract, which was executed on April 24, 2014. The pertinent provisions of the contract are as follows:

> It is understood that the Purchasers are buying this as a going business and Sellers are selling it as such. Sellers agree to continue operating the business in good faith until closing and agree to continue to promote the business in the same manner as has been done to make it successful.

> ***

> Purchasers shall be given a 10 day due diligence period after acceptance during which they may have any inspections desired made at their own expense. In the event any unacceptable adverse conditions are noted that the Sellers do not wish to correct Purchaser may elect to accept the property with the defect(s) OR Purchaser may elect to void this cont[r]act without penalty.

> ***

> All heating/cooling, electrical, plumbing systems and equipment are to be in working order on the day of closing. Any inspections desired shall be made at the expense of the Purchasers.

> ***

> Sellers certify that they have no knowledge of any current property or business violations of any health or government rule/ordinance.

***

Closing of this sale constitutes acceptance of this property in its condition as of the time of closing, unless otherwise noted in writing.

Approximately one year after the closing of the contract, the Bynums were having some work done on a ditch on the property, and a pipe was discovered. Animal blood and waste from the kill floor gushed out of the pipe into the ditch. Defendant, when contacted for answers, stated that it was an "overflow pipe." Defendant suggested that the Bynums pump the septic system and send him the bill. The problem proved harder to solve than that, however.

Various solutions were explored. The Bynums tried connecting the pipe to the septic system, but this caused daily problems with the septic tank backing up. Jason Williams, an environmental scientist with the Tennessee Department of Environment and Conservation, inspected the site. Williams was obliged to report the septic problems as a codes violation. James J. Latendresse, a private soil scientist employed by the State, performed a core drilling soil test and concluded that the soil was not favorable to installing a new septic system. Daniel Hatch, an environmental engineer with the State, examined the site, as well. According to Hatch, two options were available. One was a solution called "pump and haul," whereby the discharge would be stored in a large container on site until a vendor could haul the discharge to a treatment facility. The other possible remedy was to treat the wastewater on site. Pump and haul would cost around $50,000 per year. Treating the wastewater on site required a permit, which Hatch was skeptical would be issued because the ditch was dry. This, too, was an expensive solution. In July 2016, Hatch sent Alexander Bynum a letter, stating in part:

This office has received a report that untreated process waste water has been routinely discharged to a drainage ditch from your meat processing facility. . . . You must immediately discontinue discharging until the following has been completed and a permit to "pump and haul" has been issued:
- Installation of a storage tank with a capacity sufficient enough to hold process waste water until it can be transported to a treatment facility.
-Submit to this office an acceptance letter from a treatment facility that will agree to accept and treat your waste water.
- Contract with a licensed septic hauler to transport the waste water to the designated treatment facility. A copy of the agreement must be submitted to this office.

- Complete pages 1, 2 and 5 of the enclosed application for a State Operating Permit (SOP) and submit it to the Jackson Field Office address listed on the instruction page.

The Bynums concluded that the proposed solutions were economically unfeasible. In August 2016, the Bynums had no choice but to shut down the slaughterhouse.

Earlier, in July 2015, Plaintiffs had sued the Sampsons in the Trial Court. In their complaint, Plaintiffs alleged, in part: "Defendants breached the contract certifying the plumbing systems were in good working order on the day of closing when in fact they were not . . . As a direct and proximate result of Defendants' breach of contract, the Plaintiffs have incurred substantial damages." Trial in this matter was bifurcated, with a hearing on liability followed months later by a hearing on damages. The hearing on liability was held in February 2018.

The testimony most pertinent to the issues on appeal came from Alexander Bynum and Defendant. Alexander Bynum was questioned as to why he had not conducted a more thorough inspection of the property during the ten-day window provided under the contract, an instrument he himself had drafted:

Q. The fact that you had a ten-day narrow window --
A. Yes.
Q. -- which you gave yourself --
A. Yes.
Q. -- basically, would that be a reason to walk the property?
A. I buy and sell property regularly. I never walk the ditch of any property I ever buy like this.
Q. Well, this ditch runs along the property line; correct?
A. It does.
Q. And you could walk the top of the ditch beside where it goes down, and you would be walking your property line.
A. I would, but I don't know that I would have even necessarily seen the pipe then.
Q. And my question was -- and you gave your explanation first -- but the fact that that was along your property line, would that be a reason to go back there and walk your line?
A. I -- I'm -- no.
Q. Okay.
A. It -- I -- I don't see that that's a reasonable -- that's not something reasonable that I would ever do.

-4-

Q. Okay. So it's your position here today that because you didn't go back there and look around, had they found ancient Indian burial mounds in the back of your property and that the use of this property is going to be limited because there are Indian burial mounds --

A. Right.

Q. -- you had no responsibility to go back there and look?

A. (The witness shook his head.) It -- and I want to -- I'm not stating that I am in this court today because of finding the pipe. I am in this court today because I was not told of the pipe. So finding the pipe -- that is why I'm here is because I have -- there is a pipe that was discharging blood out of it, and that is something that we needed to know as a business.

Q. Okay. And you understand the reason I'm asking these questions --

A. Right.

Q. -- is because the contract that you drew up --

A. Right.

Q. -- put the burden on you to use due diligence and inspect the premises. You understand that, don't you?

A. Right. I would also, if I may, say that if they had not been slaughtering animals at the time, there's no way you would have seen anything coming out of the pipe. You only see blood coming out of the pipe when slaught -- animals are being slaughtered. So there's no way to even know that even if I'd done an inspection I would ever have seen the pipe.

Q. Well, you could have seen the pipe and then asked the same questions.

A. The attention that was brought to the pipe was the blood that was coming out of the pipe.

Q. I see. So if you'd just seen the pipe, you would not have asked any questions.

A. I would have. But if there is nothing --

Q. I'm sorry.

A. -- coming out of --

Q. You would or would not have?

A. I would have asked questions.

Q. Okay.

A. Yes.

Q. Because the next question being you don't have any information or any knowledge as to whether Mr. or Mrs. Sampson ever saw blood coming out of the pipe.

A. Right.

Q. You don't know if they did or not either.

A. I can't testify to what Mr. Sampson or Ms. Sampson saw.

-5-

Q. Okay. And -- and you understand that your lawsuit indicates that they knew about all this.

A. When I called Mr. Sampson and he told me, yes, he knew about the pipe and it was an overflow pipe, I assumed that Mr. Sampson knew about the pipe.

Q. Okay. Now, I thought the conversation was a text and then a phone call wherein he had agreed to pump the septic tank that he had forgotten to do before he left.

A. He -- he did. And that's what -- he told me there was an overflow, and it needed to be pumped; that's why it was run out into the ditch.

Defendant testified. Defendant owned and operated Sharon Food Locker from 1997 to 2014. Defendant testified that until he was called about the pipe, he did not know that blood from the kill floor was being discharged into the ditch. Defendant stated that he did not divert any overflow pipes from the septic system to the ditch. In all his time running the slaughterhouse, Defendant never was written up for a health hazard of any sort. Concerning the septic system, Defendant told Alexander Bynum during the purchase process that the water would sometimes back up. Defendant knew the pipe at issue existed as he had been told about it some time ago, but he never had personally seen it. With respect to the business's income, Defendant estimated that it made a gross income of around $400,000 per year at a fifteen percent profit margin when he was approached about selling it.

Regarding his representations to the Bynums about the state of the plumbing system, as well as his own knowledge about the pipe before the contract was executed, Defendant testified:

Q. Okay. And did you represent to Mr. Bynum or -- either one, Mr. Hal or Mr. Alex Bynum, did you represent to them that the plumbing system was, in fact, in working order with this particular facility?

A. Yes.

Q. Okay. Did you ever tell them issues that you had regarding the backing up into the building issues that you were having with the septic system?

A. Yes. I told them that was a sign it needed to be pumped.

Q. Okay. Did you also represent to them that you had this particular tank pumped every year?

A. Yes.

Q. And did you also represent to them that you would have it pumped right before closing to help them out?

A. Yes.

Q. Did you ever disclose to them the fact that there was an overflow pipe running from the building from the kill floor and the coolers to the ditch?

A. No, ma'am.

Q. Now, in the particular contract, there's also a provision that wherein the sellers -- and your definition of the sellers would be Mark Sampson and Kimberly Sampson equally. Is that correct?

A. Yes.

Q. Okay. Now, the "sellers certify" -- and what does "certify" mean to you?

A. Agrees, you know.

Q. Agrees?

A. Yes.

Q. Guarantees?

A. Yes.

Q. That they "certify that they have no knowledge of any health or governmental violation of any type of regulation." Do you agree with that?

A. Yes.

Q. And you signed each -- you signed the contract; correct?

A. Yes.

Q. And you initialed each page of the contract.

A. Yes.

Q. Okay. Now, do you -- don't you agree that discharging untreated waste water or overflow from a septic from a cooler into a ditch is not in compliance with governmental laws?

A. I never had any problems with this.

Q. I didn't -- I didn't ask you if you had any problems with this. I'm asking you don't you agree that discharging untreated waste or discharge from a cooler from a kill floor into a ditch is against health and environmental regulations?

A. Yes.

Q. You do agree with that; correct?

A. Yes.

Q. And you knew you had a pipe that was doing exactly that before you entered into this contract.

A. No, ma'am.

Q. You knew you had an overflow pipe from the kill floor and the coolers that discharged into --

A. No, ma'am.

Q. -- into the ditch.

A. There was a pipe supposedly from the cooler is all it was.

Q. That was run to the ditch.

A. To the ditch, yes.

Q. And the coolers were located in the kill room, where you would hang up the meat to hang for several weeks.

A. Yes.

Q. Okay. You knew all this before you entered into that contract; right?

A. Yes.

Q. And you knew this even though the contract stated that you certified that there were no business or health violations of any type of ordinance --

A. There --

Q. -- when you signed it.

A. There were none. I've never been cited for this pipe.

Q. I didn't ask -- the -- the contract doesn't say whether or not you've been cited.

A. It said --

Q. The contract --

A. It asked me does -- do -- did I know. No, I did not.

Q. You didn't know of any health or --

A. No.

Q. -- governmental violation, but you knew there was a pipe, and you knew that discharging said material is in violation of health and environmental --

A. Yes.

At the conclusion of the hearing, the Trial Court found in favor of Plaintiffs. The Trial Court, however, found that no fraud had been committed. The Trial Court did find that Defendant's failure to disclose the pipe was a misrepresentation concerning a latent defect.

In November 2018, a hearing on damages was held. Hal Bynum testified that the septic problems prevent the business from operating. Hal Bynum stated further that the septic problems prevent the business from being sold. Jayne Parrish, a real estate appraiser, testified also. Parrish testified that the real property value of the facility was $16,800 as of July 26, 2018. Roger Reed, a personal property appraiser and auctioneer, appraised the personal property left at the business after it closed. Reed valued the personal property at $15,483 as of July 6, 2018. At the hearing's conclusion, the Trial Court took the matter under advisement.

In January 2019, the Trial Court entered its order on damages. The Trial Court found that rescission was the appropriate remedy and ordered Plaintiffs to convey the real and personal property back to the Sampsons and the Sampsons to repay Plaintiffs $226,000—the contract price of $235,000 reduced by $9,000 due to supplies used by the Bynums. Alternatively, if rescission is not possible, the Trial Court entered an award of

$193,717, a figure incorporating the two experts' opinions as to the fair market value of the real and personal property, against the Sampsons in favor of Plaintiffs. Finally, the Trial Court awarded Plaintiffs $29,662.50 in attorney's fees based on a provision in the contract. Defendant timely appealed. The former Mrs. Sampson did not. As a final background matter, an amended order was entered in May 2019 to account for a typo in the final judgment.

## Discussion

Although not stated exactly as such, Defendant raises two issues on appeal: 1) whether the Trial Court erred in finding that Defendant breached the contract; and, 2) whether Hal Bynum and/or Southern Chop Shop, LLC lack privity of contract with Defendant. In the body of their brief, Plaintiffs attempt to raise the separate issue of whether, pursuant to the contract, they should be awarded their attorney's fees incurred on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in finding that Defendant breached the contract. As this Court has stated: "The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998), *no appl. perm. appeal filed*). Factor number two, nonperformance amounting to a breach, was the main disputed question at trial. Regarding contract interpretation, our Supreme Court has stated:

> When we interpret a contract, our role is to ascertain the intention of the parties. The intention of the parties is based on the ordinary meaning of the language contained within the four corners of the contract. The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness.

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citations omitted).

Defendant begins by arguing that he and his ex-wife were at a disadvantage in entering this contract. Defendant notes that Alexander Bynum, an experienced realtor, drafted the contract, and even used his business letterhead. Defendant also contends that the contract is one of adhesion—that is, a "take it or leave it" contract—and urges this Court to interpret any ambiguities in his favor. Defendant asserts further that, notwithstanding the blood-gushing pipe, "[t]he plumbing and septic systems were in working order on the day the contract purchase closed."

Having reviewed this record carefully, we find no evidence that the Sampsons were under any pressure whatsoever to enter the contract. Indeed, Alexander Bynum testified at the liability hearing that the Sampsons reviewed the contract and suggested changes.[2] This was no contract of adhesion. Instead, this was a thought-out business deal between rational adults, none of whom were operating under any duress. The fact that Alexander Bynum was a realtor is, under these circumstances, irrelevant. He approached the Sampsons about this deal in his personal capacity. In addition, the contractual provision at issue required the plumbing systems to be in working order on the day of closing. This was not some convoluted piece of trickery that might ensnare an unsophisticated party. It was quite simple and straightforward.

As to whether the plumbing system worked on the day of closing, Defendant is correct in that it *functioned* by dumping animal blood and waste into the ditch. The slaughterhouse could operate until the State came calling. However, the mere functioning of the plumbing system does not necessarily equate to it being in "working order." The discharge from the pipe violated serious governmental health and environmental regulations. Remedial efforts proved futile or inordinately expensive. In our judgment, "working order on the day of closing" means, at a minimum, that the plumbing system was not in violation of environmental and regulatory rules such that, were those violations brought to light, the business would have to shut down. After all, the Bynums entered this deal with the aim of keeping the business running. While Defendant points to language in the contract providing that "[c]losing of this sale constitutes acceptance of this property in its condition as of the time of closing," Plaintiffs did not bargain for the undisclosed health hazard of the discharge pipe. On the contrary, Plaintiffs relied on Defendant's contractual representations that the plumbing system worked. Plaintiffs were led to believe that, at least as of the day of closing, they were purchasing a slaughterhouse with a viable plumbing system—a system in "working order." Plaintiffs were misled in this regard, albeit, as found by the Trial Court, not fraudulently.

---

[2] "Q. So you drafted the contract, but they had some changes that they wanted to be put into the contract.
A. Right.
Q. Okay. And did you make those changes that they requested?
A. Yes."

Defendant argues further that the Bynums failed to exercise due diligence. Defendant states "[t]he overflow pipe was easily visible to the naked eye if a person did even a cursory inspection of the Sharon Food Locker property," and that "[d]uring that ten (10) day timeline, the knowledge of the overflow pipe could have, and would have been seen -- if Mr. Bynum had actually walked the property line as is required by due diligence." Defendant's assertions are curious given that he swore that despite his purchase of the business and his resulting 17 years of ownership and operation of this business, he did not know where the pipe was located or its true function; he just knew it existed. This pipe was located in a brushy area off to the side of the property in a drainage ditch. It was not obvious. Defendant hardly can reasonably expect the Bynums to discover in 10 days what he missed for 17 years. We find no failure of due diligence on the Bynums' part in failing to discover the pipe on their inspection.

Continuing his arguments, Defendant states that while he knew about the pipe, he did not know that blood gushed out from the pipe into the ditch. Defendant notes further that never in his 17 years of ownership was he written up for any health violation— incidentally, a disturbing oversight by the inspectors. If Defendant did not know about the discharge, he certainly had the facts necessary to know. Defendant testified that he knew all along that a pipe led from the coolers in the kill room to a ditch. Despite this knowledge, Defendant not only failed to disclose the pipe to the Bynums, he represented that the plumbing system was in working order. The Bynums, relying on Defendant's contractual representations, were saddled with a slaughterhouse that, unbeknownst to them, violated from day one of their purchase serious governmental health and environmental regulations that would lead to the business's inevitable closure. We affirm the Trial Court in its determination that Defendant breached the contract.[3]

We next address whether Hal Bynum and/or Southern Chop Shop, LLC lack privity of contract with Defendant. Defendant argues that Hal Bynum lacks privity because he never signed the agreement, never exercised any due diligence, and basically has been a passive actor in this transaction. Defendant argues Southern Chop Shop, LLC lacks privity because the contract does not reference it, nor was there any testimony at trial to support it being part of this lawsuit.

For their part, Plaintiffs argue that the issue is waived because Defendant did not raise it below. Plaintiffs argue further that if the issue of privity of contract is not waived, it is established at least as to Hal Bynum. Plaintiffs cite Defendant's testimony from the liability hearing that it was his understanding the contract included him, his

---

[3] Defendant argues in the alternative that, if the contract was not breached, Defendant fraudulently misrepresented and concealed material terms. Given our determination that the contract was breached, we find it unnecessary to address this alternative basis for affirming the Trial Court's judgment argued by Plaintiffs.

-11-

then-wife, and both of the Bynums.[4]   Defendant, in response, argues that privity of contract is an essential element of every breach of contract case, and that he did not need to specifically raise the issue below in order to raise it on appeal.

Privity of contract has indeed been described as an essential element in breach of contract actions. *Tipton v. Sparta Water Co.*, 57 S.W.2d 793, 795 (Tenn. 1933). However, the law in Tennessee is well-settled that, with a few exceptions not present here, issues not raised in the trial court may not be raised on appeal. *E.g., Blankenship v. Anesthesiology Consultants Exchange, P.C.*, 446 S.W.3d 757, 760 (Tenn. Ct. App. 2014). It is not surprising that no proof was presented at trial as to Southern Chop Shop, LLC's privity given that Defendant never raised it as an issue. As this issue was raised for the first time on appeal, we deem it waived.

As a final matter, Plaintiffs attempt to raise the issue of whether, pursuant to the contract, they should be awarded their attorney's fees incurred on appeal. We say "attempt" because, while Plaintiffs devote a section in the body of their brief to the issue, they do not identify it as such in their statement of the issues. "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Plaintiffs' issue is waived. The judgment of the Trial Court is affirmed in all respects.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Mark D. Sampson, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[4] "Q. And the contract was between you, your wife, Mr. Alex Bynum, and Mr. Hal Bynum. Is that your understanding?
A. Yes.
Q. And that's how you read the contract?
A. Yes."